**Issiah ROSS, Jr., William Morgan Porter, Johnnie Lee Palms, James C. Homer, John W. Taylor, Vernon Alexander Putman, Hosey J. White, Jr., Franklin Roosevelt Scott, Gerry Plant, Tabitha Herring, Eddie Slaughter, Plaintiffs,**

**v.**

**BUCKEYE CELLULOSE CORP., Defendant.**

**Civ. No. 86–048–ALB/AMER(DF).**

United States District Court,
M.D. Georgia,
Albany/Americus Division.

April 2, 1990.

James Finkelstein, Albany, Ga., for plaintiffs.

John G. Skinner, Smith, Currie & Hancock, Atlanta, Ga., for defendant.

FITZPATRICK, District Judge.

In an order issued by the court in the above styled case on August 11, 1989, (herein referred to as *Buckeye I*), the court concluded that defendant's Pay and Progression System was a discriminatory employment practice that had a disparate impact on blacks employed at Buckeye Cellulose Corporation (Buckeye). The court will now supplement *Buckeye I* with the following individual findings of facts and conclusions of law concerning defendant's liability to the individual plaintiffs arising from their disparate impact claim. To the extent that any of the following findings of fact constitute conclusions of law, they are so adopted.

## I. FINDINGS OF FACT

### JOHN TAYLOR

John Taylor was hired by Buckeye on September 8, 1980, and initially assigned to work in the purchase chip area. The duties Taylor performed while working in the purchase chip area included unloading trucks and rail cars; weighing rail cars; and switching boxcars and chemical cars between the various units and buildings.

In 1981 Taylor met with Buckeye management to put together his career plan. Taylor requested a career plan in the areas of E & I (electrical and instrumentation), chip storage, chip prep, or waste and water. Taylor received a career plan that had chip unloading-proficient, waste fuel-basic, and electrical-basic 50%. He was placed on a curve two pay schedule. Taylor's career plan would remained unchanged until 1985.

In 1982, Taylor went through the qualification process in the purchase chip and waste fuel areas. Taylor got a fifty percent (50%) proficiency rating in the waste fuel area and a one hundred percent (100%) proficiency rating in the purchase chip area. Five years later, in 1987, Taylor became qualified in the waste fuel area.

Buckeye's treatment of other technicians at the plant indicates that when assigning skill areas, Buckeye generally took advantage of the experience a prospective employee brought with him or her to the company. Ray Harth, a white technician at Buckeye, is an example of an employee who received credit for his previous work experience. Harth came to Buckeye with

ten years of experience as a mechanic and was assigned to the mechanical maintenance area and placed on a curve five pay schedule.

Taylor, on the other hand, was not afforded the opportunity to take advantage of the skills he brought to Buckeye. Relying on his strong background as an electrician, Taylor made numerous requests to cross train or transfer into an area that would allow him to take advantage of his past electrical experience. However, he never had E & I placed in his career plan nor was he ever given the chance to formally cross train in E & I while at Buckeye. Don Kersey, a white employee who worked in the woodyard with Taylor, was allowed to shift over to E & I. At the time Kersey changed positions, Taylor had over ten years of electrical experience and a state electricians license; Kersey had very little electrical experience and no experience in industrial and commercial electrical work.

An employee who started off at Buckeye in a similar position as Taylor was one Alvin Wellons, a white male. Wellons and Taylor both began in the purchase chip area with purchase chip in their initial career plan. Wellons, who was given the chance to cross train, had maintenance and waste and water skill areas added to his career plan. He was placed on a curve four pay level. Taylor was not allowed to cross train and wound up being placed on a curve two pay level.

Although Buckeye never did make formal arrangements for Taylor to cross train in E & I, the company did place electrical basic 50% in Taylor's career plan and gave him the chance to occasionally work in the electrical area and to assist E & I technicians at various times during shutdowns. Buckeye contends that by giving Taylor these opportunities to pick up training, Taylor suffered no harm by not being able to formally cross train in the E & I area. The court concludes that the informal cross training is but one example of Buckeye's true assessment of Taylor as a valuable employee who had skills in the E & I area which Buckeye took advantage of without simultaneously reflecting that fact in Taylor's career plan.

On an employee record sheet dated 11/20/80 (def. ex. 99 at 4), Buckeye management personnel Tony Brightman and Charlie Wisekal state that they have reviewed Taylor's career plan and discussed ways that they might take advantage of his past electrical employment experience. They agreed that Taylor should spend time training with the E & I group. Upon being allowed to work in E & I, Taylor was specifically cited for doing a good job in E & I and providing valuable assistance to the team. After making the assessment that Taylor had the skills that would make him a valuable asset to the E & I team and that he should spend time training in E & I, Taylor received a career plan that did not include E & I nor was he ever allowed to formally cross train in E & I. He was given the skill of electrical, but only at a qualification level of 50% basic.

The evidence indicates that Taylor had the ability and the qualifications to work in E & I or at the very least deserved to have the skill added to his career plan as a cross skill. It is claimed by Buckeye that they ceased cross training in E & I, yet other technicians had it in their career plans and Buckeye admits Taylor informally cross trained in E & I. Buckeye appreciated Taylor's electrical experience and profited from it without compensating Taylor to the same extent as other white Buckeye technicians with comparable skills. It was through the use of Buckeye's discriminatory pay and progression system that they were able to do so.

The many talents Taylor had that Buckeye took advantage of do not coincide with Buckeye's placement of Taylor on a level two pay curve. The court has noted above Taylor's valuable electrical experience and Buckeye's use of it. The court also notes that Buckeye thought enough of Taylor to make him a shift team coordinator, although, it did later remove him from the position before shift team coordinator ever appeared in his career plan. Taylor assumed his role as shift team coordinator in 1981, around the same time one Sonny Ard,

a white male technician on a pay curve 5 level, also ascended to the position of shift team coordinator. Buckeye generally assigned the shift team coordinator position to technicians who were on a pay curve of at least three or better and only to exceptional technicians who could lead other team members. During the tenure of Taylor as shift team coordinator and that of his successor, Johnnie Lee Palms, shift team coordinators, other than Taylor and Palms, were the highest paid persons in their skill area.

In Taylor's case, Buckeye's own rating of Taylor's performance lends support to a finding that there was no legitimate business reason for Taylor not to be placed on a higher pay scale than curve two and consequently pay him more money. During the first few years of Taylor's employment at Buckeye, he received the type of appraisals that resulted in other technicians being placed on a pay curve higher than two. Taylor had a nine month appraisal in September of 1980 in which he was assessed as performing slightly above average. (Def. ex. 99 at 37). In August of 1982 Taylor received a performance appraisal indicating he was doing an outstanding job. (Def. ex. 99 at 31). On that particular appraisal sheet Taylor received an above average rating in every one of the appraisal areas. In February of 1983 Taylor again received an assessment that indicated he was performing his job in an above average manner. (Def. ex. 99 at 30).

The court makes every attempt not to second guess the business decisions of the defendant. However, when defendant's own appraisals, compared to the appraisals of other similarly situated white technicians, indicates that based on the criteria it established, Taylor should have received a more valuable career plan and been placed on a higher curve; the court cannot help but reach the conclusion that Taylor has been treated unfairly.

Taylor has demonstrated that he has extensive electrical experience, which Buckeye does value, and that he had the qualifications and ability to be paid on a pay curve higher than two. On the other hand,

Buckeye has not shown that it had a legitimate business reason for not placing Taylor on a higher pay curve. The court concludes that the only logical explanation as to why Taylor was not allowed to cross train nor given a higher curve rating was because he was a victim of Buckeye's discriminatory Pay and Progression System.

## TABITHA HERRING

Tabitha Herring, who was a member of the first hire group, began working at Buckeye on June 9, 1980. Herring started out with Buckeye in the waste and water treatment area. Herring was first trained in the water area which took approximately six months. Around ten months to a year after she had completed water training, Herring started her waste area treatment training. At her first qualification board meeting in 1982, Herring received a 50% proficiency rating in water and a 25% proficiency rating in waste. The actual qualification process that Herring went through amounted to her being asked a number of questions for a period that lasted approximately one hour and twenty minutes.

In 1984 Herring took another qualification test in which she received a 100% proficiency in water and a 75% proficiency in waste. Herring failed to get a 100% rating in waste despite having worked in the area for four years without any incidents concerning environmental or turbidity problems. After each of Herring's qualification tests she was not told about any errors she made, no one went over any of her answers with her, and nobody explained to her why she had qualified at the rate and level she was assigned. Herring did not get another opportunity to take a qualification exam until 1987.

Although Herring did not officially cross train in mechanical maintenance, around the beginning of 1982, she took all the required courses in mechanical maintenance and passed every one of them. The classes she passed had to be successfully completed before a technician would be allowed to cross train in mechanical maintenance. Before being allowed to formally cross train however, Herring was informed that she would need to qualify 100% profi-

cient in both waste and water before she could go on to maintenance. In 1987, Herring qualified as 100% proficient in both areas.

Unlike Herring, there were persons, both black and white, in the waste and water area who were permitted to formally cross train before they got 100% proficient in both areas.

Only two other waste and water treatment technicians besides Herring had mechanical maintenance in their career plans; and of those two only Charlie Kare, a white male, was allowed to cross train while the other two individuals, Herring and Harold Hankerson, both black, never got the opportunity to cross train.

Herring argues that she was injured by defendant's discriminatory Pay and Progression System because she should have been paid a higher wage. According to Herring, one of the ways she was injured by the System was the unjustified removal of mechanical maintenance from her career plan.

Herring was originally placed on a curve three and given a career plan that included mechanical maintenance, which had one of the highest point values offered. In December of 1982, Herring had mechanical maintenance removed from her career plan which caused her to drop from a curve three pay level to a curve two. Defendant did not replace mechanical maintenance in Herring's career plan with a skill of similar value.

Defendant produced a great deal of job performance evidence in hopes of demonstrating that it had a legitimate business reason for removing mechanical maintenance from Herring's career plan and placing her on pay level two. Much of that evidence was not considered because the court found it to be after the fact justification which did not affect defendant's decision to remove mechanical maintenance from Herring's plan and to place her on pay curve two. Defendant does concede that a change in the Pay and Progression System in 1982 was partially responsible for removing maintenance from technicians' career plans. It goes on to argue, however, that the removal of mechanical maintenance from Herring's plan was predicated on her slow progress in technical growth in her primary areas and lack of contribution. The court heard conflicting testimony concerning those allegations and finds that Herring's technical ability and contributions were no different than other similarly situated technicians who did not likewise have skills removed from their plans.

Another asserted reason for the removal of mechanical maintenance from Herring's plan was defendant's assessment that Herring did not possess nor develop the technical skills necessary to adequately perform in the mechanical maintenance skill area. The court notes, however, that Herring took and passed all the courses in mechanical maintenance a technician was required to take and pass before being allowed to cross train in mechanical maintenance. Herring demonstrated that she has the ability and qualifications to train in mechanical maintenance.

The court is not convinced by the defendant's assertions that it had a legitimate business reason for removing mechanical maintenance from Herring's plan. Rather, the court finds that it was the effects of defendant's discriminatory Pay and Progression System that caused the removal and Herring's subsequent reduction in pay.

JOHNNIE LEE PALMS

Buckeye hired Palms on September 8, 1980, as a member of the last hire group and assigned him to work in the woodyard. During his orientation, Palms expressed a preference to work in the woodyard unit. He was given an initial career plan in 1981 that included the skill areas of longwood, shortwood, and waste fuel. Palms began working primarily in the shortwood area but later requested a transfer from the shortwood area to waste and water treatment, which he felt was more in line with his educational and work experience. When Palms found out he could not transfer to waste and water because there were no openings in that area at the time, he requested the cross skill of mobile maintenance.

Palms never formally transferred from the shortwood area. However, he did get the chance to work in the waste and water treatment area. Palms was introduced to the waste and water treatment area in the latter part of 1981 where he picked up some training in waste treatment. He first went down to the waste and water treatment area for his cross skill training during the first quarter of 1984 before his 1984 qualification examination.

Palms began training in water treatment in February of 1986 and finished the training in January of 1988 when he was declared proficient in the area. On his proficiency examination in 1988, Palms was assessed as 100% proficient in waste treatment and 100% proficient in water treatment. Before Palms received his proficiency, he was doing roughly the same job as technicians who were already proficient, such as white technicians Willard Parker, A.J. Niette, Lynn Barry, Jerry Barry, and a black technician named Tommy McCuller, who were all being paid more money than Palms.

A review of Palms' initial career plan shows that it called for him to become proficient in longwood and shortwood and to become basic in waste fuel and basic in waste treatment. Approximately a month after he received his career plan, Palms had shift team coordinator added to his career plan in October of 1981. The opening was created when John Taylor was removed from the position. Palms duties as shift team coordinator included: bringing the team together to initiate team meetings; lead discussions concerning performance results and maintenance problems; deciding on run strategies; and reporting to management the results of the team meeting and any other factors that had a possible impact on the operation of the woodyard.

As a shift team coordinator, in terms of the way Buckeye rated a technicians skills, Palms had a career plan equal to that of Sonny Ard and Joseph Willard Parker; and a higher rated plan than Alvin Wellons. However, Ard, Parker, and Wellons, all white technicians at Buckeye, were paid a higher salary than Palms. During the tenure of Palms as shift team coordinator and that of his predecessor, John Taylor, shift team coordinators, other than Palms and Taylor, were the highest paid persons in their skill area. Based on the evidence presented, the court concludes that there is no legitimate business reason that explains why Palms was not compensated similarly to the other shift team coordinators.

Buckeye clearly considered the shift team coordinator one of its top positions for technicians, evidenced by the fact that the position carried one of the highest point totals given for a support skill. The court concludes that Palms failure to receive a salary equal to that of the other shift team coordinators, Ard, Parker, and Wellons, can be attributed to defendant's discriminatory Pay and Progression System which arbitrarily doled out career skills and allowed Buckeye management to have Palms perform on the same skill level as other similarly situated white technicians, but pay Palms less for doing it.

Palms asserts that there are other instances of his suffering injury because of defendant's discriminatory Pay and Progression System which occurred after he stepped down as shift team coordinator. When Palms gave up the shift team coordinator position in March of 1983, based on his belief that he was not being paid as much as the other shift team coordinators, he was told that his resignation from the shift team coordinator position would move him back a curve. Fifteen months later his pay curve was reduced from pay curve three to pay curve two. Palms said he contends that even without shift team coordinator in his career plan, his skills warranted placement on at least a pay curve three when you compared him to other equally qualified white Buckeye technicians.

Upon completion of his 1984 qualification examination, Palms received a rating of 100% proficient in longwood and 75% proficient in shortwood. Palms, nevertheless, remained on a curve two pay level. Other white Buckeye technicians with lower qualification scores such as Tolbert Owens, who

qualified at 50% proficient in longwood and 100% basic in wastefuel, and Harris Miller, who qualified at 50% proficient in longwood and 25% proficient in shortwood, were placed on a curve three pay level and paid more money than Palms.

Defendant has failed to convince the court that it had a legitimate business reason for not paying Palms on a pay curve three or better. Defendant's own proficiency scores of Palms, along with other evidence presented in this case, shows Palms to be a highly competent hard working technician who had the ability and qualifications to be a top performer in the longwood/shortwood area, although he was not paid as such. The court concludes that, even after Palms gave up his shift team coordinator position, the defendant has not produced a legitimate business reason for compensating Palms at a pay curve level lower than pay curve three. The fact that Palms was placed on a pay curve lower than three can be attributed to Buckeye's discriminatory Pay and Progression System.

## JAMES C. HOMER

James Homer was hired by Buckeye on July 7, 1980, and assigned to work in the pulping unit as a mechanical maintenance technician. In 1981, he received his initial career plan from Darrell Hart. The career plan Homer received listed only a basic in mechanical maintenance and had his pay curve level set at curve three.

Homer took his first qualification board examination in 1982 and was qualified as 100% basic in mechanical maintenance. When the new written qualification examinations were instituted at Buckeye, Homer obtained a qualification level in mechanical maintenance of 100% proficient unit wide and 100% proficient plant wide.

When he became 100% basic in mechanical maintenance following his 1982 qualification board examination, Homer still did not have any other skill areas added to his career plan. Homer specifically asked Buckeye management to add any type of cross training skill to his career plan. Homer's requests were turned down despite the fact that there were other mechanical maintenance technicians in the same unit as Homer who had training skills in their plans, but were not actually undergoing the training.

In his position as a mechanical maintenance technician, Homer worked with and performed essentially the same tasks as white Buckeye technicians Herman Williams, Donald Ritch, Freddy Hogg, Joe Rogers, Haywood Jerkins, Tim Phelps, Charles Willis, Mickey Taylor, and Glenn Hair. However, Homer's pay was less than every one of those Buckeye technicians despite the fact that they all had the same job classification.

Defendant contends that Homer was paid less because he was not as skilled as the white technicians who received more money than Homer. Defendant's measure of Homer's skill level was primarily established through subjective qualification review boards, which were a component part of Buckeye's discriminatory Pay and Progression System. Defendant produced evidence which it asserted demonstrates that, it had a legitimate business reason for not including more skill areas in Homer's career plan and placing him on a higher pay curve. The court finds that almost all of that evidence was after-the-fact justification which did not actually affect those decisions made by the defendant. The court further finds, after analyzing all reliable and credible evidence, that Homer had the qualifications to have additional skills placed in his career plan and to be placed on a higher pay curve; defendant did not have a legitimate reason for not doing so.

It is uncontested that the Pay and Progression System rewarded technicians according to the skills contained in their career plans. Buckeye technicians Williams, Ritch, Hogg, Rogers, Jerkins, Phelps, Willis, Taylor, and Hair received a higher wage than Homer because they had numerous skills placed in their career plans, unlike Homer whose original career plan only listed a basic in mechanical maintenance. Homer was told by his manager Hart that the reason he was being paid less than some of the other white maintenance technicians was due to his career plan.

Based on Homer's qualifications and defendant's failure to produce a legitimate business reason for not putting additional skills in Homer's career plan and correspondingly placing him on a higher curve level, the court finds that, if not for the discriminatory Pay and Progression System, specifically the subjective manner in which Homer had skills placed in his career plan, Homer would have received a higher salary.

## FRANKLIN SCOTT

Franklin Scott was hired by Buckeye on September 27, 1981, as a process technician in the pulping unit. Scott was in a hire group that began work at Buckeye approximately fourteen months after the majority of Buckeye technicians were hired. Scott expressed a preference to work in the power house unit or in process. He was told not to put down a preference in a particular skill area because that would be arranged for him once he arrived in the unit.

After being assigned to the pulping unit and going through about a week of orientation in the pulping unit, Scott was asked to indicate the areas in which he desired to work. Scott responded by listing digesting as his first choice. Scott was eventually assigned to the 0–2 (oxygen generation) area where he would work as an 0–2 operator in the pulping unit. Scott's career plan issued in 1982 listed the 0–2 skill area at a proficient level and his pay level was set at curve two.

Scott took his first qualification board examination in 1982 and received a 25% basic in 0–2. Scott disputed the score he was given and on or around December 28, 1982, formally appealed the results reached by the qualification board. Scott's complaint was that the test was not standardized but rather a subjective test that one could not prepare for. It was subjective in Scott's opinion because there were methods and practices concerning the 0–2 process that were still in the developing stage that had not yet been proven to work. Scott's appeal to change his score was not granted by the defendant.

In attempting to prove that he was injured by defendant's discriminatory Pay and Progression System, Scott compares himself to white technicians from his hire group and other 0–2 technicians who Scott asserts he was just as qualified as despite their being paid more than him. Scott has failed to convince the court that he possesses skills comparable to that group. Defendant presents convincing evidence that it had a legitimate business reason for paying Scott less than members of his hire group and the other 0–2 technicians.

The court proceeds very carefully when examining evidence of Scott's job performance to determine whether it represents after-the-fact justification which actually failed to affect the critical decisions that resulted in Scott receiving less pay than members of his hire group and other 0–2 technicians. In the case of Scott, there is uncontroverted evidence that he had problems performing his job in a satisfactory manner. Defendant could have, and evidently did, reach a decision very early in Scott's career with the company that he would at best be an average employee in whom the company should not invest a great deal of time and energy attempting to train in other skill areas. Scott contends that defendant's discriminatory Pay and Progression System caused him to be paid less than other similarly qualified white technicians because of his race. The court finds that it was Scott's job performance that resulted in his lower salary.

## HOSEY WHITE, JR.

Buckeye hired Hosey White, Jr. on July 7, 1980. White expressed a preference to work in unit one as his first choice and listed power house (unit four) as his second choice. White was given the position of mechanical maintenance technician and assigned to work in unit four. The specific area in unit four that White was to work in was the power blower area where he would be responsible for the air system and scoot blower. There were two other technicians, Mike Hutchings and Olin Hicks, initially assigned to the same area as White.

White attended training classes that lasted approximately three months. The classes covered a wide variety of areas and included hands on training. After the

three month training period concluded, White was assigned to C team along with Clifton Locke, Loyce Clark and Olin Hicks. White started off working primarily with Loyce Clark until the two developed a strained relationship. White shortly thereafter requested a transfer and was reassigned to A team where he was matched up with Jimmy Harrison.

White's first career plan gave him a basic in mechanical maintenance and placed him on a curve two pay scale where he currently remains. Before the career plan was issued by Chip Akin, White expressed his preference to Akin that he be assigned to the maintenance area and be allowed to get training in E & I, process, bark boiler, and power boiler. White and Akin discussed the degree of proficiency that White would attain in mechanical maintenance; after which White made the choice that his career plan should reflect only a basic in mechanical maintenance. White objected to having mechanical-proficient in his plan because he did not think he would be able to acquire that level while in unit four. After further discussions concerning White's career plan, White and Akin agreed that the E & I skill area in his plan would be too difficult for White to attain, so White agreed to a career plan that called for mechanical maintenance and bark boiler. White never did cross train in bark boiler and his career plan summary does not indicate that it was part of his career plan. White asked Akin if he could cross train in welding and was turned down, although, Akin sent four white mechanical maintenance technicians, Loyce Clark, Terrell Edalgo, John Mays, and Calvin Benny Moore, to train in welding.

White has failed to convince the court that he was paid less than any similarly qualified white Buckeye technician on account of defendant's discriminatory Pay and Progression System. Defendant had a legitimate business reason for fashioning White's career plan the way it did and for paying him on a curve two level. Early in his career, White exhibited difficulty performing the technical assignments mechanical maintenance technicians often encountered. He, along with fellow mechanical maintenance technicians John Mays and Benny Moore, was one of the worst offenders when it came to completing work schedules. It was White himself who rated his skill level at basic rather than proficient. He has not demonstrated that he was qualified to be paid on a pay curve higher than two. The court has found no evidence to show that, absent the discriminatory Pay and Progression System, White would have received any different compensation nor that, while the System was in place, he was held back or paid less than white technician with skills comparable to his.

## VERNON ALEXANDER PUTMAN

Buckeye hired Vernon Alexander Putman on July 7, 1980, as part of its July hire group. Putman indicated to Buckeye, when asked, that he would prefer working in the powerhouse unit. Putman was assigned to the powerhouse unit to work as a mechanical maintenance technician. He first began working with B team which was comprised of himself and Barbara Key. In the latter part of 1982 Putman was reassigned to A team where he worked with John Mays.

In early 1982 Putman had his initial qualification board examination. Putman's examination was given orally. He was not told what he would be tested on before hand nor were any of his answers discussed with him after the test was completed. Putman originally received a 50% basic that was changed the next day to a 75% basic, after Putman spoke with his manager Steve Pender. Putman did eventually qualify 100% basic in 1983. Putman is now rated at 50% proficient but has not yet qualified under the new system that replaced the old Pay and Progression System.

Putman's first career plan had him listed as having a basic in mechanical maintenance. He was placed on a curve two pay level where he currently remains, although a Buckeye manager, Frank Dennis Hooper, did wonder why Putman was not ranked on curve three. Putman's second career plan had a basic in either recovery boiler or evaporators. Putman never did cross train in either of those, or any other areas.

Some of his fellow white mechanical maintenance technicians did have the opportunity to cross train; Jimmy Harrison cross trained in calcining, Olin Hicks cross trained on the bark boiler, Terrell Edalgo cross trained on evaporators, and John Mays had the opportunity to cross train in calcining. Bennie Moore, Loyce Clark, John Mays, and Terrell Edalgo all had the opportunity to go to the welding area.

Putman had the same career plan as Randall Washington, a white mechanical maintenance technician, but Putman was ranked on a curve two while Washington had a curve three ranking. Putman believes he has been treated unfairly when compared to Randall Washington and also when compared to Patty Mason and Terrell Edalgo. The court has determined from the evidence that Putman was not as qualified as those individuals. Putman was a hard working competent mechanic. However, much like Hosey White, his mechanical maintenance skills were not comparable to most of the other Buckeye mechanical maintenance technicians both black and white. Putman performed his job at a basic level and as such defendant has demonstrated that it had a legitimate reason for paying Putman on pay curve level two. Putman suffered no adverse effect because of Buckeye's discriminatory Pay and Progression System. The court is convinced that no matter what kind of employee advancement system was incorporated at Buckeye, Putman's salary and position would not have changed.

## GERRY PLANT

Gerry Plant was hired by Buckeye on June 9, 1980. At the time he was hired, Plant expressed a preference to work in maintenance and did in fact receive an assignment to work as a mechanical maintenance technician in the woodyard. He was placed on a curve three pay scale.

Plant's original career plan listed mechanical maintenance at a proficiency level. In 1984 Plant was issued a new career plan that had mechanical maintenance-proficient and administrative coordinator. Plant had asked to have machinist, unit five building maintenance, welding, and process skill areas included in his career plan, but did not get any of those skill areas placed in his plan. Other Buckeye mechanical maintenance technicians, including Allen Massey, Ray Harth, Roy Peterson, Doug Johnson, Debbie Hearn, Chuck Whaley, Bill Chester, Wayne Tharpe, and Robert White, had cross skills placed in their career plans in 1981.

Plant was concerned that when he first began with Buckeye he was not receiving the job assignments that required the application of technical mechanical skills. He also talked to management about what he perceived to be a situation where blacks in his unit were not being allowed to cross train and were being kept on the lower pay curves by not having cross skills put into their career plans. The evidence presented in this case indicates that very few, if any, blacks in unit one mechanical maintenance had cross skills placed in their career plans prior to 1984.

As time went by, Plant developed an expertise in working on the sludge press, the chipper, the fulghum cranes, the bark hog, the chip hog, the stacker, and the reclaimer. He gained a reputation as being one of Buckeye's better employees who was an excellent mechanic on the chipper.

By June 6, 1983, Plant had moved up the pay steps on pay curve three to the point that he had gotten all the pay raises that one could get while on curve three. At that point, the only way Plant could have received a pay raise would have been for him to have items added to his career plan so that he would move up to a new pay curve. Many white employees had likewise topped out on their particular curve level. Near the end of 1984, Buckeye's Pay and Progression System was put on hold and there were no more curve changes. Employees were allowed, however, to continue advancing within their curve level.

The qualification examinations, career plans, and the resulting curve level assignments, all component parts of defendant's Pay and Progression System, clearly had a negative impact on Plant. Plant was recognized as one of the better maintenance technicians. However, on his first qualifi-

cation board examination in 1982, he received a score that at first appeared to be a 25% proficient, but ended up being written on his qualification form as 100% basic. On the mechanical maintenance qualification board examinations administered by Buckeye in 1982, Plant and all other black mechanical maintenance technicians failed to get a rating higher than basic; the white mechanical maintenance technicians originally assigned to the same group as Plant received ratings no lower than proficient. In 1987, after the old Pay and Progression System had been replaced, Plant achieved a 100% proficiency rating in mechanical maintenance.

The evidence presented by Plant demonstrates that his mechanical maintenance ability was equal to or better than similarly situated white mechanical maintenance technicians who were placed on a higher pay curve than Plant. Examples include the placement of Chuck Whaley, a white technician given only a 50% proficiency in woodyard maintenance, on curve four pay level; the placement of Bill Chester, a white technician given only a 25% proficiency in woodyard maintenance, on a curve four; and the placement of Deborah Hearn, a white technician given only a 100% basic score, on a curve four. Their placement on curve four occurred at a time when Plant had qualified as 75% proficient in woodyard mechanical maintenance and was being paid on a curve three pay level.

Although defendant produced evidence which it asserted demonstrated that it had a legitimate business reason for paying Plant the salary he was paid, the court finds that much of that evidence was after-the-fact justification which did not affect defendant's decision to place Plant on a curve level three. The remaining evidence amounted to nominal criticism which fails to provide a clear explanation for Plant's failure to be placed on a curve higher than three.

Accordingly, the court finds that defendant did not have a legitimate business reason for not placing Plant on a pay curve higher than three. Furthermore, the failure of Plant to be placed on a curve higher than three occurred as a result of Buckeye's discriminatory Pay and Progression System.

## WILLIAM PORTER

William Porter started working for Buckeye on December 3, 1979, as a technical trainer in the Woodyard. His job entailed developing training programs in the longwood and shortwood area for the incoming technicians. Porter had hoped he would be assigned a mechanical maintenance position. However, despite years of prior experience as a mechanic, Buckeye chose not to make Porter a mechanical maintenance technician. Instead, Buckeye made a legitimate business decision that, with his three years prior experience in the logging business, Porter would be of more value to the company working in the longwood/shortwood area.

On his career plan dated November, 1982, Porter was assigned the skills of longwood-proficient, shortwood-proficient, and water-proficient. Porter's second career plan contained longwood-proficient, shortwood-proficient, water-basic, mobile maintenance-basic, and placed Porter on a curve three pay level.

After Porter completed an initial six week period of training technicians, he performed follow-up training, updated training programs, and trained technicians on new equipment. Porter carried out his duties primarily in the longwood and shortwood area of the woodyard, although he did do some work in water treatment and worked in mobile maintenance multiskilling.

In the early part of 1981 Porter took his first qualification board examination. Porter's qualification board examination covered longwood and shortwood. The result of Porter's examination was that he received a 100% proficient in longwood and shortwood. Sometime in 1983, Porter took another qualification board exam in water treatment. On his water treatment qualification Porter was rated at 50% proficient.

On December 16, 1985, Porter received a rating of 100% basic in mobile maintenance. He did not go before a qualification board to receive the mobile maintenance rating, but rather answered some questions posed

by the maintenance manager George Palms, who decided Porter should get the 100% basic rating. Despite being given only a basic in mechanical maintenance, Porter wrote the preventative maintenance plan for the Terex, a large bulldozer, which other P.M. formats were modeled after.

Porter's work in the shortwood and longwood areas caused him to be exposed to poison ivy and poison oak which triggered an allergic reaction in him. Porter had medication he would take, however, the company did not want him to take the medication while he was at work because it caused him to get drowsy and become unable to perform his job safely. Porter asked that this problem be solved by allowing him to work in the water treatment areas and mobile maintenance. Buckeye made an effort to accommodate Porter's request by assigning him, as much as possible, to those areas during the summer months when the poison ivy and poison oak were most prevalent. In another attempt to solve Porter's allergy problem, Buckeye offered to transfer Porter to the waste and water treatment area or certain other units. Porter declined the invitation, expressing his desire not to leave the woodyard unit nor work exclusively in waste and water.

The area Porter wanted to work in was mechanical maintenance. He made repeated requests to transfer into that area. Although his requests to transfer were turned down, Porter did spend about a year in mobile maintenance cross training and approximately six months in waste and water working in water treatment. Other unit one white technicians, Lynn West Barry, Charlie Kare, and Randy Lawhorn, were allowed to transfer into mechanical maintenance. Willie Keen, a black technician, who worked in the waste fuel area was also allowed to transfer into maintenance on a full time basis.

Porter had outstanding technical skills and encountered few problems actually performing his assigned tasks. However, Porter had a serious attendance problem that ultimately cost him his job with Buckeye. It was a problem that extended throughout Porter's employment at Buckeye. The evidence presented demonstrates countless incidents of Porter's unauthorized tardiness or absences from work.

Porter was made aware of the fact that his chronic absenteeism had an effect on his job rating. Porter received a three day suspension in August of 1983 because of what his manager, George Palms, described as dishonesty and inadequate communication regarding tardiness from work. In a note to the file prepared by Palms on Porter's return to work, Porter was reminded that he stood a good chance of being fired if he was involved in any further unacceptable work standards violations.

After another unauthorized absence from work, Palms, in a memorandum dated February 20, 1984, again informed Porter that he continued to seriously jeopardize his employment due to excessive lost work time. On May 10, 1984, Porter called his manager Bryant Orr, and told him he would not be able to report to work that night because he would be in too rough a shape from being intoxicated. The next day Porter checked himself into the Houston County Detoxification Ward and stayed there for a total of twenty eight days. Porter returned to work on June 12, 1984, at which time he was told that if he did not correct his work attendance problem his employment with Buckeye would be terminated. On July 3, 1986, Buckeye fired Porter because of his frequent absences and for failing to return to work after recovering from injuries Porter suffered in a non-work related accident that occurred in December of 1985.

Porter asserts that because of defendant's discriminatory Pay and Progression System he was unable to transfer to the maintenance area and also failed to get a career plan that had any real value to it; thereby causing him to be unfairly compensated. The court finds that decisions made by Buckeye concerning Porter's career plan and salary were not based on discrimination, but rather legitimate business considerations predicated on Porter's unfavorable work record. Porter suffered no injury as

a result of Buckeye's discriminatory Pay and Progression System.

## ISSIAH ROSS, JR.

Issiah Ross, Jr. was hired by Buckeye on June 9, 1980. Ross, who did not express a preference to work in any particular area, was made a waste and water treatment technician and assigned to work in the woodyard unit. Ross was placed on B team along with Harold Hankerson and Willard Parker. As a waste and water treatment technician, Ross basically did the same job as Willard Parker, Lynn Barry, and Jerry Barry.

Ross' original career plan called for a basic in water treatment and a basic in waste treatment. His pay curve was set at curve two where it remained until he was fired by Buckeye. Ross' next career plan had waste treatment-proficient, water treatment-proficient, and chip unloading-basic placed in it.

Ross stayed in waste and water treatment during his entire career at Buckeye. In fact, none of the black technicians in waste and water were ever transferred to another technical area while Ross worked at Buckeye. In Ross' case he never did apply for a transfer, although he asserts he would have had he known that E & I technicians and mechanical maintenance technicians were on a higher pay curve than waste and water treatment technicians.

On June 7, 1984, Ross took a qualification examination in waste and water which resulted in his being rated 100% proficient in water and 50% proficient in waste. Ross had another qualification in waste on December 7, 1984, and was told he received a rating of 75% proficient. A sheet indicating the results of that December 7, 1984, qualification examination shows that a 75% was originally written down as the result of his qualification and then scratched over and replaced with the notation of not proficient. (Def. ex. 2 at 63).

Ross was put on an improvement plan prior to his 1984 qualification board. He was asked to write up the improvement plan but did not do so. One was written up for him by Lisa Routh. Ross' improvement plan primarily listed projects that Ross should concentrate on completing. Ross was the only one in his area put on an improvement plan. After the plan was drafted and reviewed with Ross, he was asked and agreed to present documentation which would demonstrate his improvement according to the plan. Ross did not produce any written documents to show that he was making progress towards completing his improvement plan.

Ross became disenchanted and frustrated with the Pay and Progression System because of what he perceived to be its discriminatory effect. His relationship with his fellow employees and managers began to suffer as a result. Ross did express some of his concerns to Buckeye management personnel. On February 20, 1984, Ross met with Hooper and asked why black maintenance technicians were not allowed to cross train in the process area.

In 1984 Ross had numerous notes placed in his file indicating that his managers were not totally pleased with his dedication to his job and questioned whether Ross was performing up to the fullest extent of his ability. On July 2, 1984, Ross was informed by Buckeye management that they considered his contribution level unacceptable. He was told that if he did not achieve proficiency in both waste and water treatment and improve his overall performance and application of skills, he would not remain employed by Buckeye. Ross took a qualification in April of 1985 and was told that he did not get a 100% proficiency. Shortly thereafter, Ross was fired from his job at Buckeye.

During the early years of Ross' employment at Buckeye, when Ross and other technicians received their career plan, cross training assignments, and were placed on their respective pay curve levels, Ross was considered a valuable employee whose skills were comparable to Lynn Barry, Jerry Barry, and other white Buckeye waste and water treatment technicians who wound up with initial placements on a curve three pay level or higher. There is testimony indicating that Ross was able to carry on day-to-day operation of the waste

and water treatment area with acceptable results. In running the day-to-day operations, Ross performed the same job that other pay curve three white waste and water technicians were doing, although he was only being paid on a curve two pay level. A telling indication of Ross' qualifications and ability to perform his job as well as the curve three waste and water treatment technicians was the fact that his manager chose him, and not one of the curve three technicians, to train technicians who were cross training in water treatment. Ross carried out the task of training these technicians, despite the fact that he was not rated as proficient in water treatment at the time.

In an effort to establish that it had a legitimate business reason for placing Ross on pay curve two, Defendant presented evidence which indicated that there were times when Ross had problems performing his job. The court finds, however, that almost all of that evidence was after-the-fact justification which could not have affected defendant's decision to place Ross on a curve two pay level. Furthermore, in balancing the evidence, the court finds that in his early years with Buckeye, Ross did not encounter any greater performance problems than the other white technicians who were paid on curve three.

Buckeye's Pay and Progression System caused almost every white technician who started out in waste and water treatment to be initially placed on curve three and almost every black waste and water technician to be placed on curve two. That same system injured Ross by causing him to be placed on curve two instead of curve three, where, based on his qualifications, he deserved to be. Buckeye has failed to convince the court that it had a legitimate business reason for placing Ross on curve two when similarly situated and equally talented white waste and water treatment technicians were placed on curve three.

## EDDIE SLAUGHTER

Eddie Slaughter was hired by Buckeye on September 28, 1981. Slaughter was assigned to work in the woodyard unit in the chip unloading area. Slaughter's June, 1984 career plan summary shows that he had a career plan that called for chip unloading at a proficient qualification level. That same career plan summary listed a total new career plan that included chip unloading-proficient, waste fuel-proficient, and longwood-proficient.

In 1983 Slaughter had a proficiency rating of 100% basic in chip unloading and 100% basic in waste fuel. In 1984 his proficiency rating was 100% proficient in waste fuel and 100% proficient in chip unloading.

Slaughter was initially placed on a curve two pay plan and was still on curve two when his June 1984 career plan was prepared.

Slaughter asserts that he was injured by Buckeye's Pay and Progression System because its use resulted in him being paid less money for doing the same work as equally qualified white Buckeye technicians. Despite his charges, however, Slaughter failed to appear at the trial and present any testimony to substantiate his claim. Nevertheless, Slaughter's attorney attempted to prove his case, but he was unable to demonstrate that Slaughter was personally discriminated against. In Slaughter's case, the court was left with insufficient evidence to reach the conclusion that Slaughter suffered any injuries because of Buckeye's discriminatory Pay and Progression System.

## II. CONCLUSIONS OF LAW

■ Plaintiffs in the above styled case contend that defendant had a facially neutral employment practice which had a disparate impact on plaintiffs in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* In *Buckeye I*, the court set out to determine the validity of the plaintiffs' claim through application of the *Wards Cove* test.[1] The

---

1. In a suit brought under the disparate impact theory the plaintiff must first establish a prima facie case by: (1) articulating a specific employment practice; (2) showing a racial disparity; and (3) demonstrating a causal connection between the specified employment practice and the racial disparity. *Wards Cove Packing Co. v.*

court initially found that defendant's Pay and Progression System, which utilized career plans, skill points, rankings, qualification review boards, and pay curves, was an integral part of the plant's function and was a definite policy/practice of the company.

■ Next, after an exhaustive study of the relevant statistical evidence, the court found that plaintiffs had established the existence of racial disparity in regard to the salaries paid to similarly situated[2] black and white technicians at Buckeye. The court then ruled that the Pay and Progression System was the primary, if not sole, method of determining a technicians salary and that a causal connection existed between the exhibited racial disparity and the Pay and Progression System. Having found that plaintiffs met their burden of establishing a prima facie case under the disparate impact theory of recovery, the defendant inherited the burden of producing evidence which showed that the Pay and Progression System furthered legitimate employment goals.[3]

Defendant met its burden of production and the court found that the Pay and Progression System had a legitimate business goal. However, the court went on to rule that an alternative employment practice that did not have an undesirable racial effect similar to that which the Pay and Progression System had was available to Buckeye. The court's ruling established that the goals involved in the Pay and Progression System represented a legitimate business justification for the Pay and Progression System; but the actual mechanics of defendant's Pay and Progression System, implemented in an attempt to reach those goals, did not pass the second stage of the business justification test be-

cause an alternative practice was available to achieve those goals with less racial impact. Thus evolved *Buckeye I's* holding that defendant's Pay and Progression System, now abandoned, was a discriminatory practice which had a disparate impact on black technicians employed at Buckeye. Having made the above conclusions of law in *Buckeye I*, the purpose of this opinion is to now examine the claim of each plaintiff and determine if he or she was individually injured by defendant's Pay and Progression System.

■ Under the disparate impact theory of recovery, the plaintiff must prove individual harm. *See Stephen v. PGA Sheraton Resort, Ltd.*, 873 F.2d 276, 279 (11th Cir.1989). In order to demonstrate individual harm, the individual plaintiff must show that application of the specific discriminatory practice has caused him or her to suffer a significant adverse effect. *Hill v. Seaboard Coast Line R. Co.*, 885 F.2d 804, 811 (11th Cir.1989). Defendant can rebut a plaintiff's claim of individual injury by demonstrating that the adverse effect he or she complains of was dictated by a legitimate non-discriminatory reason. *Stephen*, 873 F.2d at 279. Lack of ability or inferior qualifications are considered by this court to be legitimate non-discriminatory reasons upon which an employer can base its employment decisions. *See Stephen*, 873 F.2d at 280. The court will not, however, rely on "after-the-fact justification" nor "general non-time specific testimony concerning employees' inefficiency...." *Crawford v. Western Elec. Co. Inc.*, 745 F.2d 1373 (11th Cir.1984).

■ In the case at bar, the parties dispute the basis upon which the court can determine whether or not an individual

---

*Atonio*, —— U.S. ——, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

2. In *Buckeye I*, the court found that the function, operation, and manner in which Buckeye set up the technicians system resulted in the technicians being similarly situated.

3. Upon a prima facie showing of discrimination based on a disparate impact theory of recovery, the case moves into the secondary evidentiary

stage known as the Business Justification Stage. *Wards Cove*, —— U.S. at ——, 109 S.Ct. at 2125. The eventual question in this examination concerns the extent that the challenged practice furthers the employers legitimate employment goals. *Id.* This stage contains two alternative aspects: (1) the proffered business justification; and (2) available alternative practices. *Id.* If a plaintiff can persuade the court on either of these aspects of this stage of the case, then he or she can recover.

plaintiff had the requisite ability or qualifications. Defendant asserts that in a situation in which an employee is claiming disparate impact, the employee is required to show that he met all of the employer's criteria, both objective and subjective, to establish that he was qualified. Plaintiffs argue that the court should only consider objective criteria. The court concludes that it may consider both objective and subjective criteria in the case *sub judice*. "It [is] within the district court's role and capabilities to assess whether the subjective employment qualification was bona fide and whether an employer's testimony that the plaintiff did not possess the qualification was credible." *Seaboard Coast Line R. Co.*, 885 F.2d at 809.

The court will proceed very carefully in evaluating the subjective standards and qualifications used by defendant in implementing its Pay and Progression System. The court is mindful of the fact that in reaching its finding in *Buckeye I* that the Pay and Progression System was a discriminatory employment practice, the court concluded that defendant's lower level management had practically autonomous subjective authority given to them to carry out the System and that the ranking system was almost totally a subjective program with few, if any, standards to guide the managers. Furthermore, the qualification examinations and career plans developed under the Pay and Progression System were primarily the result of lower level management exercising its subjective decision making authority. In instances where defendant's assessments, standards, and qualifications concerning individual plaintiffs are wholly subjective, the court will not consider such evidence.[4] To allow defendant to use such evidence it created under a system found to be discriminatory, when the very effect of the discriminatory system complained of was the failure of the defendant to accurately assess and establish the qualifications of the individual plaintiffs, would be grossly unfair to the plaintiffs in this case.

■ Having previously found in *Buckeye I* that the defendant's Pay and Progression System, with its many component parts, was a discriminatory employment practice that had a disparate impact on black employees at the Buckeye plant, the court now turns its attention to determining whether the individual plaintiffs in the instant case have carried their burden of establishing that they individually suffered injury as a result of defendant's discriminatory Pay and Progression System. Based on the above findings of fact, and the findings of fact and conclusions of law made in *Buckeye I*, the court rules that plaintiffs Taylor, Herring, Palms, Homer, Plant, and Ross have demonstrated that they suffered individual injury as a result of defendant's discriminatory Pay and Progression System. Accordingly, the court holds that the defendant is liable to plaintiffs Taylor, Herring, Palms, Homer, Plant, and Ross for damages incurred by these plaintiffs as a result of their injuries. Plaintiffs Scott, White, Putman, Porter and Slaughter did not prove that they suffered individual injury as a result of defendant's discriminatory Pay and Progression System and thereby failed to establish liability on the part of defendant towards them. As expressed in *Buckeye I*, the court seeks only to settle the liability issue at this stage and will address remedies at a later date.

SO ORDERED.

---

4. *See Crawford v. Western Elec. Co. Inc.*, 745 F.2d 1373, 1385 (11th Cir.1984), where the court held that "an employer may not utilize wholly subjective standards to judge its employees' qualifications and then plead lack of qualifications when its promotion process is challenged as discriminatory."