959 F.2d 1542
 58 Fair Empl.Prac.Cas. (BNA) 1406,
58 Empl. Prac. Dec. P 41,469
Mabel MORGAN, Plaintiff-Appellee,
v.
CITY OF JASPER, A Municipal Corporation, Tommy Knight, in
his personal capacity and in his capacity as
Director of the Parks and Recreation for
the City of Jasper,
Defendants-Appellants.
 No. 91-7520.
 United States Court of Appeals,
Eleventh Circuit.
 May 4, 1992.
 
 Robert E. Parsons and David A. Lee, Parsons, Lee & Juliano, P.C., Birmingham, Ala., for defendants-appellants.
 Charles C. Tatum, Jr., Jasper, Ala., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH, Circuit Judge, GODBOLD and JOHNSON*, Senior Circuit Judges.
 GODBOLD, Senior Circuit Judge:
 
 
 1
 This is a Title VII case in which plaintiff, a black female, charged that the city of Jasper, Alabama discriminated against her in wage rate and discharged her in retaliation for her filing of a complaint with the Equal Employment Opportunity Commission. She sought money damages, a declaratory judgment, and an injunction. The city asserted that it had indefinitely suspended plaintiff because it discovered that she had falsified her application for employment with the city in a material respect relating to her reason for leaving prior employment.
 
 
 2
 The district court granted plaintiff relief in all respects. It entered a declaration that the city had violated her rights as guaranteed by Title VII and permanently enjoined the city from discriminating against employees in wage rates on account of race and from retaliating against black employees for filing complaints with the E.E.O.C. It granted plaintiff back pay for the amount it found she was underpaid for the two years before her suspension plus full lost wages from the time of her suspension to the time of her conviction for theft of city funds less interim earnings, a total of $48,358. The court also granted attorney fees of $12,273.20 plus out-of-pocket expenses.
 
 Following is a chronology of events:
 
 3
 --March 18, 1985: Plaintiff hired as secretary for Parks and Recreation Department ["PRD"].
 
 
 4
 --October 1986: City discovered funds missing from PRD, where plaintiff was handling cash payments for use of recreational facilities. Method of handling cash changed but plaintiff continued to receive fees.
 
 
 5
 --September 1987: Plaintiff complained to her supervisor, Tommy Knight, regarding her wages. Knight informed the mayor and city council that historically all employees in PRD had been underpaid. He recommended that all be increased. No action was taken.
 
 
 6
 Plaintiff and Willie Moore, a black male assistant PRD supervisor, complained to the Jasper Civil Service Board that they were being discriminated against in their wages because of their race. Knight expressed dissatisfaction that they had "gone over his head." He told plaintiff that she should not "rock the boat" else her job might be eliminated.
 
 
 7
 --October 12, 1987: PRD discovered bookkeeping discrepancies and missing funds. Plaintiff was relieved of most of her duties and told not to accept any more fees for use of PRD facilities. Investigation begun by Police Department.
 
 
 8
 --Between October 12 and November 4, 1987: Knight was informed by a police officer that plaintiff had falsified her employment application with respect to the reason for her termination by K-Mart, a former employer.
 
 
 9
 --November 3, 1987: Plaintiff filed E.E.O.C. complaint of wage discrimination.
 
 
 10
 --November 5, 1987: Plaintiff was indefinitely suspended by Knight. The district court found that Knight knew she had filed an E.E.O.C. complaint at the time that he suspended her.
 
 
 11
 --December 4, 1987: Civil Service Board hearing regarding Morgan's suspension. Plaintiff was represented by counsel. Suspension upheld. A transcript of this hearing was admitted into evidence at trial.
 
 
 12
 --December 14, 1987: Plaintiff filed second E.E.O.C. complaint, asserting that her suspension was in retaliation for filing the first complaint.
 
 
 13
 --1988: Indictment of plaintiff on charge of first degree theft of city funds. This indictment later dismissed.--September 21, 1989: E.E.O.C. considered both complaints filed by plaintiff and found no violation of Title VII. Issued plaintiff a right-to-sue letter.
 
 
 14
 --January 1990: Second indictment of plaintiff on charge of first degree theft of city funds.
 
 
 15
 --January 4, 1990: Plaintiff filed this suit against the city and Knight.
 
 
 16
 --September 30, 1990: Plaintiff found guilty of stealing money received for rental of PRD facilities, sentenced to five years, and ordered to pay restitution to city of $13,490.76.
 
 
 17
 --March 28, 1991: Bench trial in district court. Oral findings and conclusions from the bench. Knight dismissed as defendant. Judgment for plaintiff against remaining defendants.
 
 
 18
 --July 1, 1991: This appeal filed.
 
 
 19
 --July 26, 1991: Criminal conviction affirmed by Alabama Court of Criminal Appeals.
 
 The wage claim
 
 20
 The district court's findings run this way. First it concluded that the beginning wage for a secretary with the city was more than the beginning wage for a clerk. The basis for this conclusion was that Hedy Hall was hired as a secretary at $377.50 biweekly at approximately the same time in 1983 that Anita Naramore was hired as a clerk at $352.80 biweekly. Both of these persons were white. Also, the payroll clerk for the city testified that secretaries for the city were normally paid more than clerks. Operating on the conclusion drawn from the above testimony--that a secretary's beginning wage should be more than that of a clerk--the court examined plaintiff's exhibit 2, a table prepared by the city payroll division, showing salaries of clerks and secretaries for the 1983-88 period. The court expressed dissatisfaction with this data but nevertheless, based upon it, held that plaintiff, hired in 1985 as a secretary, was paid less than clerks hired in 1985, when, according to the above conclusion, Morgan should have been paid a higher beginning salary than a newly hired clerk. Plaintiff's exhibit 2, however, shows no clerks hired in 1985. There were clerks in the city's work force in 1985 who earned more than plaintiff's starting salary, but none was hired in 1985. All had from one to six years' experience with the city by 1985. In short, the comparables between secretaries and clerks relied upon by the district court did not exist.
 
 
 21
 Nor was there any meaningful comparison of salaries as between secretaries. There was only one other secretary at the city when plaintiff was hired in 1985. The other secretary, Joy Wilson, a white female, earned a salary in 1985 higher than plaintiff's beginning rate. But she had been employed by the city since 1979 and was secretary to the mayor, in which position she had special duties and responsibilities. Plaintiff acknowledged that this secretary was not comparable to her.
 
 
 22
 Plaintiff's theory that she was underpaid as compared to white secretaries doing comparable work in 1985 is further undermined by the fact that she was hired at the same salary paid her white predecessor, Hedy Hall, who had been employed by the city since 1983 and had received regular raises.
 
 
 23
 Plaintiff testified that after she and Willie Moore, the assistant PRD supervisor, complained to the Civil Service Board about their wages, the Board investigated the charges and found that two white females, Anita Naramore and Tracey Jones,[1] took the city civil service test at the same time as plaintiff and scored lower than plaintiff but were hired as clerks at higher wages than Morgan received as a secretary. But plaintiff's exhibit 2 shows that Naramore had been hired in June 1983 at a wage rate substantially less than plaintiff's beginning salary of $435.69 biweekly. Tracey Drummond was listed on the 1986 payroll as a clerk hired in 1983, and Tracey Scott was listed on the 1985 payroll also as a clerk hired in 1983. Plaintiff was not hired until mid-1985. This attempt to show differing wage treatment fails.
 
 
 24
 A second finding said by the court to undergird its conclusion of wage discrimination was that Moore, the black assistant PRD supervisor, was paid less than assistant supervisors of other city departments. The evidence does not sustain this conclusion. The court itself asked Moore whether he believed other assistant supervisors were getting paid more than he was. Moore responded, "Yes, sir. But it's different departments." The court next asked whether it was Moore's "perception that whites in similar positions as [his] in other departments [were] paid more than [he was]?" Moore answered in the affirmative. The court then said:
 
 
 25
 All right. Now I don't know whether this information is in evidence, but it will be, because I want to see what the assistant directors of the other departments of the city are paid. Is it going to be presented to me, Mr. Tatum [counsel for plaintiff]?
 
 
 26
 Counsel responded that testimony would be presented on this matter. It never was.
 
 
 27
 Furthermore, Moore gave conflicting testimony at trial as to whether any valid pay comparison between himself and other assistant supervisors could be conducted. Moore testified at one point that he was the only assistant department supervisor in Jasper. When defendants' counsel asked Moore, "Are there any other persons with the City of Jasper who have the title or classification of assistant director of a department?," Moore answered in the negative. Defendants' counsel reiterated, "So as far as you know, from the time you started up until the moment, you are the only assistant director of a department for the city?" Moore indicated that counsel was correct. However, when plaintiff's counsel later asked, "Are there assistant supervisors in other departments?," Moore responded that there were others back in 1987 who held the same or similar positions to his at PRD. There was no substantial evidence that assistant supervisors in other departments--if there were any--had duties comparable to those of Moore and therefore that their salaries were relevant. The only straightforward evidence of salary comparison between Moore and any other assistant supervisor tended to show nondiscrimination. Moore had been hired to succeed a white male at the same salary as his predecessor.
 
 
 28
 In summary, plaintiff did not present a prima facie case of wage discrimination.
 
 Retaliatory discharge
 
 29
 On her job application with the city plaintiff indicated that she had left her employment with K-Mart for "better working hours." The application contained this provision: "False, incorrect, incomplete, or misleading statements may disqualify you from employment." The city suspended Morgan for the asserted reason that it had learned that she had falsified her application for employment by stating that she had left K-Mart for better hours when in fact she had been discharged for violating its bad check policy and for mishandling cash. The city has not contended that it suspended Morgan for the theft of city funds for which she was later indicted and convicted.
 
 
 30
 The statement, often repeated in this case, that the city suspended Morgan because she made a false statement on her application can be misleading. The record makes explicit what is implicit in the shorthand statement--the city discovered the truth that Morgan was discharged from K-Mart for mishandling money as well as her own insufficient funds check, which caused the city to become aware that the statement on the application was false.
 
 
 31
 Morgan's supervisor, Knight, explained the reason for her suspension on November 5 and the procedures that were followed. He testified:
 
 
 32
 She had misrepresented on her job application the reason why she left K-Mart. It was--she put on her job application, it was for better working hours. There was an investigation done, nd [sic] it was found that she had been fired for mishandling of a check and cash shortage in their cash room.
 
 
 33
 Tr. at 86. He explained that during the investigation into the missing funds at PRD the false statement on the application was brought to his attention. Tr. at 111. He wanted to give Morgan a chance to explain, so he wrote a letter to her saying that he was considering suspending her. It said that a recent investigation of Morgan's employment record at K-Mart had indicated that she was discharged for discrepancy and shortages in the handling of money. Board Hearing at 75. The letter stated:
 
 
 34
 The position you were hired for with the City of Jasper also has to do with the handling of money. Information of such a discharge by a former employer is very significant to the consideration of applicant for this job.
 
 
 35
 Board Hearing at 24. The letter pointed out that if Morgan had been truthful the city would have investigated the K-Mart matter prior to hiring her. Board Hearing at 76.
 
 
 36
 Knight and two other supervisors met with plaintiff on November 5. The letter was read to her and she was given a copy. She was told that she had an opportunity to give Knight a reason why she should not be suspended. She refused to say anything on the ground that she did not have an attorney present.
 
 
 37
 Later that day Knight delivered to Morgan a second letter, which stated that after considering what the city had learned through its investigation of her former employment, most notably the K-Mart matter, and "considering those things [she] had to say" [which in fact was a refusal to make any statement], she was suspended. Board Hearing at 56. Knight testified that he took this action on the advice of counsel. He also stated that he did not know until the civil service hearing that Morgan claimed she had "advised" Turman of the K-Mart matter.
 
 
 38
 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), established the framework of proof for a Title VII claim. Plaintiff had the initial burden in this case to present a prima facie case of retaliatory discharge. This is step one. 42 U.S.C.A. § 2000e-3(a) (West 1981 and Supp.1991) prohibits retaliatory discharge as follows:
 
 
 39
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 40
 To state a prima facie case of retaliatory discharge, Morgan had to prove by a preponderance of the evidence that she "(1) engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation; and (3) that there is a causal connection between the protected activity and the adverse employment action." Whatley v. M.A.R.T.A., 632 F.2d 1325, 1328 (5th Cir. Unit B 1980); see also Lindsey v. Mississippi Research and Development Center, 652 F.2d 488, 491 (5th Cir.1981). To establish the causal connection between her protected activity and the adverse employment action, Morgan had to demonstrate that defendant was discriminatorily motivated, which she could do by circumstantial evidence. See Perryman v. Johnson, 698 F.2d 1138 (11th Cir.1983). Morgan carried her burden of proof under step one by proving that she had been warned not to rock the boat about alleged wage discrimination and that she was suspended on November 5, two days after filing her first E.E.O.C. complaint alleging wage discrimination. This proof established a rebuttable presumption of retaliatory discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981).
 
 
 41
 A burden of production then arose for the defendant to rebut this presumption by articulating clearly and specifically a legitimate, nondiscriminatory reason for plaintiff's discharge. Burdine, 450 U.S. at 254, 258, 101 S.Ct. at 1094, 1096; McDonnell Douglas, 411 U.S. at 803, 93 S.Ct. at 1824. This is step two. Unlike the plaintiff, defendant's burden was neither one of proof nor persuasion. Likewise, defendant did not need to meet its burden by a preponderance of the evidence. Nor did the city have to persuade the court that the discharge was actually motivated by the proffered reason. Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.... The explanation provided must be legally sufficient to justify a judgment for the defendant." Burdine, 450 U.S. at 254-55, 101 S.Ct. at 1094; see also Doyal v. Marsh, 777 F.2d 1526, 1534 (11th Cir.1985).
 
 
 42
 Defendant met its burden of articulating a legitimate, nondiscriminatory reason for Morgan's suspension. This rebutted the presumption of retaliatory discharge, and the burden shifted to plaintiff under step three, which she was required to meet by a preponderance of the evidence. She could meet her new burden in two ways: first, by persuading the court that it was more likely that a discriminatory reason rather than the proffered reason motivated the city to suspend her. Alternatively, she could meet her burden indirectly by showing that the employer's proffered explanation was unbelievable, i.e., that its reason was a pretext. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; see also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1472 (11th Cir.1991); Rollins v. Florida Dept. of Law Enforcement, 868 F.2d 397, 399 n. 4 (11th Cir.1989).
 
 
 43
 We have described plaintiff's evidence of discriminatory motivation: first, that three months before plaintiff's suspension she had been warned not to "rock the boat" about her wages, and, second, within two days after filing an E.E.O.C. complaint charging wage discrimination she was suspended. On the other hand, a year earlier funds were missing in plaintiff's department, and procedures were changed but she continued to receive cash fees. Then, two to three weeks before her suspension, it was discovered that there were bookkeeping discrepancies and more missing funds. As a result of this discovery plaintiff had been relieved from accepting payments of fees and from most of her other responsibilities. An investigation was begun by police. Police found, and informed plaintiff's supervisor, that she had falsified her application with respect to the reason for her termination by K-Mart. The supervisor suspended her, giving as reasons the false application, the city's discovery of the truth about the termination of her money-handling employment at K-Mart, and the fact that her false application deprived the city of the investigation it would have made had it known the truth. This is, therefore, not a direct evidence case but a case of competing inferences drawn from the circumstances.
 
 
 44
 We turn to the issue of whether the city's proffered explanation was merely pretextual. The evidence of pretext consisted of plaintiff's testimony that at her employment interview, despite the false statement on her application, she explained to her interviewer, Turman, the circumstances of her termination by K-Mart and he accepted her explanation as satisfactory. Turman could not recall her giving an explanation.
 
 
 45
 The evidence lays bare that Morgan's "explanation of the circumstances"--assuming that she gave an explanation--was itself false. At trial she testified that she told Turman that she had been accused of mishandling her own bad check, that she had filed an E.E.O.C. complaint against K-Mart, and that K-Mart had offered her job back to her. According to plaintiff, Turman remarked that she ought to get the matter straightened out and then noted that she had worked in an attorney's office since leaving K-Mart. That, she said, was the end of it.
 
 
 46
 Following the above testimony, plaintiff was asked by her attorney to describe the check incident at K-Mart. Morgan testified that she had worked in the cashroom where she handled cash and checks. She wrote a personal check for $250 payable to K-Mart. Presumably she obtained cash for the check from K-Mart. The check was deposited by K-Mart and returned by the bank for insufficient funds. On her lunch hour she took the check to the bank, demonstrated to the bank that the check should have been honored, received cash for the check, and came back to K-Mart with the cash. Morgan then said that she had explained all of this to Turman during the job interview.
 
 
 47
 The record of the Civil Service Board hearing contains another recital by Morgan of what she said that she told Turman during her interview. She recounted to the Board the following explanation of the K-Mart incident that she said she had given to Turman: the assistant manager brought Morgan's bad check back from the bank; Morgan called the bank and discovered that the bank had made a mistake as to whether there was enough money in her account to cover the check; she took the check to the bank at lunchtime to make good on it; when she returned from the bank, the manager had already counted the cash in the cashroom and found $250 missing; Morgan then gave the manager $250. Morgan told the Board that she had told Turman that she had been terminated by K-Mart because she had handled the bad check situation poorly, that she had filed an E.E.O.C. complaint, and that she had refused K-Mart's offer of reinstatement.
 
 
 48
 K-Mart's personnel manager had testified at the Civil Service Board hearing. She related that the assistant manager brought a bad check, drawn on plaintiff's account, from the bank to the cashroom where Morgan was working that day. K-Mart's manager was notified of the bad check. He searched the cashroom during lunch, and discovered that the check was missing. He and another employee then balanced the cashroom and found it to be $250 short. When plaintiff returned from lunch, she told them that the returned check had been written by a person named C.A. Sherer--that it had not been her check at all. When plaintiff was confronted about the missing check and the $250 shortage in cash she said that she had seen C.A. Sherer outside of the store during lunch, had gotten the cash from Sherer to make the check good, and had brought in the cash. The manager then contacted Sherer, who said that she had not been in the store that day. The personnel manager testified that Morgan was dismissed for violation of K-Mart's corporate policy regarding handling of bad checks.
 
 
 49
 K-Mart's separation report on Morgan was introduced into evidence at the Civil Service Board hearing. It sets out the following circumstances as the reason for Morgan's termination: one of K-Mart's assistant managers retrieved from the bank a bad check for $250 drawn on Morgan's account; he brought the check to the cashroom; while Morgan was at lunch, K-Mart's manager and another employee balanced the cash in the cashroom and found it to be $250 short; Morgan returned from lunch with $250, stating that this money was to replace a bad check written by C.A. Sherer. K-Mart officials called the bank and found that, during the morning, it had processed an insufficient funds check on Morgan's account and that it had no record of a check by Sherer. K-Mart officials then called Sherer who said that she had not been in the store that day. The separation report stated that K-Mart would not reemploy Morgan.
 
 
 50
 Plaintiff's version at trial of what she told Turman described an innocent mistake in her account caused by the bank. This was inconsistent with the documentary evidence from K-Mart's personnel file, the testimony at the Board hearing of K-Mart's personnel manager, and the statement given at trial by another K-Mart personnel manager. The overwhelming evidence, oral and documentary, is that plaintiff gave a bad check drawn on her account. Nothing supports plaintiff's statement that the bank erred in handling her account. After payment was refused by the bank, the assistant manager brought the check back from the bank, looked at it, and identified it as drawn on Morgan's account. The bank verified that it had processed her NSF check. Plaintiff was supposed to make a record of any returned check, but she made no record of her check (or of the phantom Sherer check). Instead she took the check to the bank during her lunch hour and secured cash from the bank, which she brought back to the store. But other evidence showed that when confronted by K-Mart personnel with what she had done, with the fact that the check was missing, and with her failure to make a written record of the check as required, Morgan denied having written a bad check at all. She falsely identified the maker of the check as Sherer and falsely claimed to have obtained cash from Sherer during the lunch hour to make the check good. The bank had no record of having processed and returned a Sherer check. Sherer knew nothing about the check. K-Mart personnel had picked up the bad check from the bank, examined it, and knew that it was drawn on Morgan's account. None of these events were included in the "explanation" that she gave to the Civil Service Board and to the court at trial asserting innocence on her part and an error by the bank.
 
 
 51
 Summarizing, plaintiff's effort to prove that the city's asserted reason for discharge was pretextual rests squarely on her contentions that she explained the circumstances of the false entry on her application and that the city accepted the explanation. That effort collapses in the face of overwhelming evidence that, assuming she gave an "explanation" to Turman at all, the "explanation," as she describes it, was a tissue of falsehoods. The district court was, therefore, plainly erroneous in finding that Morgan explained the facts and circumstances surrounding her leaving the K-Mart job and that Turman accepted her explanation.[2] Plaintiff's effort to prove pretext failed.
 
 
 52
 With pretext not proved, there is no presumption that plaintiff's suspension was the product of discriminatory intent. Lewis v. Smith, 731 F.2d 1535, 1538 (11th Cir.1984). The issue then becomes whether Morgan discharged her ultimate burden of establishing by a preponderance of the evidence that discriminatory intent motivated the employer. She did not satisfy this burden. In reaching this conclusion we bear in mind that Morgan worked in a money-handling position at PRD. For the second time in a year money was discovered missing. An investigation disclosed that Morgan had been fired from her cashier's job at K-Mart for mishandling money and mishandling her own insufficient funds check, and that her statement giving a false reason for leaving K-Mart had caused the city not to investigate the K-Mart circumstances before hiring her. Given the opportunity to respond to the city's concerns, Morgan declined to comment.
 
 
 53
 It is not necessary that we consider Mt. Healthy City School Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). It was not briefed by the parties in the district court proceedings, and the district court did not consider it.
 
 
 54
 REVERSED with directions to enter judgment for defendants.
 
 
 
 *
 Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 Plaintiff was unsure of the last name of this person and identified her as Tracey Jones or Tracey Drummond. Plaintiff's exhibit 2 reflects that the city employed clerks by the names of both Tracey Scott and Tracey Drummond but not Tracey Jones
 
 
 [2]
 The district court judge announced his findings and conclusions orally from the bench at the conclusion of the trial. While not the basis for our decision, two aspects of his oral opinion are noteworthy. Nothing in the opinion suggests that the judge gave any consideration to the devastating evidence contained in the transcript of the Civil Service Board hearing. Second, the court accepted as correct substantially everything to which Morgan testified; he does not appear to have given any consideration to questions of credibility arising from the fact that at the time of trial Morgan was a convicted felon, having been convicted for stealing $13,490.76 from the city