**Annie Beatrice DANIEL, Plaintiff,**

v.

**CHURCH'S CHICKEN, Defendant.**

**Civil Action No. 94–0901–RV–C.**

United States District Court,
S.D. Alabama,
Southern Division.

Sept. 10, 1996.

Sandra Meadows, Mobile, AL, for plaintiff.

Jonathan S. Harbuck, Birmingham, AL, for defendant.

### ORDER

VOLLMER, District Judge.

This action was brought by plaintiff Annie Beatrice Daniel ("Daniel"), a former employee of the defendant, Church's Chicken ("Church's"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, to redress alleged instances of discrimination in employment. Daniel was employed as a manager at two different Church's stores in the Mobile area during the relevant time period 1990 through February 11, 1993, the day Church's dismissed Daniel from her employment. Three claims were presented at trial. First, Daniel maintains that she was subjected to disparate pay on the basis of her race and/or gender during her employment. She also complains the she was illegally discharged on the basis of her race and/or gender. Finally, Daniel claims that she was discharged in retaliation for making complaints to her superiors about her pay. Daniel seeks to recover back wages in this litigation.

A bench trial was held in Mobile, Alabama on the 22nd and 23rd of August, 1996. The plaintiff was present and represented by counsel during the two-day trial. A corporate representative of the defendant and the defendant's attorney were also in attendance.

The court has carefully considered all of the testimonial and documentary evidence that was presented and admitted during the course of trial. In addition, the court has considered the arguments of counsel and the parties' pre- and post-trial briefs and proposed findings of fact and conclusions of law. Its review of the record complete, the court now makes the following factual and legal determinations.

### Findings of Fact

Plaintiff Daniel is a black female who began working for defendant Church's as a team member in 1972 at Store No. 327 in Prichard, Alabama near Mobile. After approximately two months there, she transferred to Store No. 319 located on Michigan Avenue in Mobile. She continued to work at several stores in the Mobile area between 1972 and 1993, the year that she was discharged by Church's. Daniel worked her way through the ranks, eventually becoming a manager at Store No. 319. In the year leading up to her promotion to manager,

Daniel had been employed as an assistant manager. In 1990 Daniel spent a short stint at Store No. 722, a "training" facility in Chickasaw, Alabama. Daniel and her supervisor, Area Manager Larry Brooks ("Brooks") (a white male), thought that retraining might help Daniel improve her managerial capabilities which were found to be deficient during inspections performed by Brooks on his routine visits to Daniel's store. After spending two weeks at the training store, Daniel returned to store No. 319.

At some point in 1990 after Daniel's retraining session, Daniel called Sue Borden ("Borden"), Church's Human Resource Manager in Atlanta. Borden is a white female. Daniel told Borden she felt that she was being paid in a discriminatory manner as compared to the other managers in the Mobile area. A chart comparing the pay of selected Mobile area managers was presented at trial as Plaintiff's Exhibit 3. It reveals the following hierarchy of weekly salaries as of the end of 1990: Phyllis Dean (a white female) was making $322, Myra Moore (a black female) was making $318, Gerald Cross (a black male) was making $317, Daniel (a black female) was making $270, and Ernest Caffey (a black male) was making $255. A few months after the phone call, Borden, Brooks, and Jim Goebel, Church's District Manager for Mobile in 1990, met with Daniel about her objection. Daniel complained that Gerald Cross (then the manager of No. 327, the store Daniel was managing when she was fired) and Phyllis Dean (the manager of Store No. 722, the training store in Chickasaw) were making more than her. Brooks told Daniel that her salary would be increased if and when she improved her performance. Borden told Daniel that Brooks and Borden would discuss the matter and get back to Daniel later. Plaintiff then received a $100 per week raise between the end of 1990 and the early months of 1991 before she began managing Store No. 327, thus taking her weekly salary from $270 per week to $370 per week. See Plaintiff's Exhibit 3.

In August or September 1991, Daniel was offered the manager's position at Store No. 327, the Prichard store on St. Stephens Road where she first began her employment with Church's. Daniel was presented with this opportunity only after Brooks had offered it to all the other managers in the Mobile area and these other managers had declined it. However, it should be noted that prior to receiving the offer of Store No. 327, Daniel was given the chance to manage a Church's Chicken in Evergreen, Alabama. Daniel declined the Evergreen offer because she did not want to move or make the long commute from Mobile every day.

Store No. 327 is a high volume store with longer hours but Daniel chose to accept it because of the possibility of receiving higher income. Daniel acknowledged during cross-examination that her decision to accept the management position at Store No. 327 was completely voluntary and that she knew before accepting it that she would be taking on a higher volume store requiring longer hours. Daniel's salary at Store No. 319 before accepting this new position was $370 per month plus a percentage of any profit earned at the store. See Plaintiff's Exhibit 3. She accepted these same terms when she took over Store No. 327 but believed that her income would increase since the higher volume store had greater potential for profit. Sometime after taking this new managerial position, Daniel asked Brooks about getting a raise. According to Daniel, Brooks replied that her pay would increase if the sales and profits at her store increased. Brooks testified on cross-examination that he never promised Daniel a raise. He said that once in 1990 he told Daniel that her salary would be increased if her performance improved.

Daniel commenced her management of Store No. 327 around September 1991. In late 1991 or early 1992, Daniel complained to Brooks during one of his visits to her store that she felt it was unfair for her to receive only $370 per week since her predecessor at Store No. 327 (Gerald Cross) had received $431 per week at the time he left the position. In March 1992, Daniel's salary was increased to $392 per week. Daniel was still dissatisfied and continued to ask Brooks for a raise which would place her on par with the salary Gerald Cross had received when he left the position she now held.

Daniel received one final raise in January 1993 from $392 per week to $404 per week. Daniel was fired by District Manager Reginald Coachman ("Coachman"), Brooks' superior, on February 11, 1993. Coachman is a black male. As of the date of her termination, the hierarchy of weekly salary for the relevant Mobile area managers was as follows: Phyllis Dean (a white female) was making $439, Ernest Caffey (a black male) was making $428, Myra Moore (a black female) was making $427, and plaintiff Daniel was making $404. *See* Plaintiff's Exhibit 3.

Daniel received many written performance reviews in the relevant time period. Several of these documents and other reports were admitted into evidence. *See* Defendant's Exhibits 3–13. Most of these reviews were completed by Brooks. In addition, the court was presented with testimony by Brooks and Coachman concerning the condition of the stores where Daniel worked as well as Daniel's own management skills. This evidence demonstrates that Daniel was continually notified of inadequate job performance. Some of the recurrent problems included: failure to keep employee files and other paperwork up to date, failure wear her full uniform, failure to follow-up on known problems, failure to keep the store clean, and failure to adequately train personnel. On January 24, 1996, Brooks visited the store and found the employee files in disarray. Brooks also found that food had been served after its holding time had expired. Daniel had been informed about both of these problems in the past and acknowledged such at trial. For both of these deficiencies, Brooks stated in the written "Counseling Record" that Daniel would be watched closely in the upcoming weeks and months and that failure to correct either problem could result in her termination. *See* Defendant's Exhibit 10.

Coachman assumed control over Mobile area Church's Chicken stores in November of 1992 in his capacity as District Manager. Coachman testified that he and Brooks jointly made the decision to fire Daniel after each independently considered his own visits and documentation on Daniel's Store No. 327.

Coachman made at least three visits to Daniel's store before he fired her, though Daniel was not on duty at each visit. Coachman discovered employees out of uniform, low employee morale, a substandard chicken product, and slow service at the drive-thru window. Once, Coachman witnessed insubordination by Daniel to Brooks. On that occasion, Brooks was reviewing Daniel's performance records with her when Daniel pushed the record books away and declared that Brooks just did not care for Daniel as an individual.

Coachman also reviewed several documents on Daniel and her store during the course of making the decision to fire her. Those documents included action plans, counseling records, inspections, performance evaluations, a vendor complaint, a notice of hazard from the City of Mobile concerning litter on the back property of Store No. 327, and "mystery shopper reports". *See* Defendant's Exhibit 15 (Coachman's notes listing the documents he reviewed before discharging Daniel). In addition, Coachman testified that all of the performance evaluations prepared by Brooks, despite their many negative reflections on Daniel's management abilities, were actually too kind toward Daniel given the conditions he personally observed in the store.

### Conclusions of Law

#### A. Discriminatory Pay Disparity

A plaintiff in a Title VII action has two legal theories available for the prosecution of his claims. One is known as "disparate impact". Under the disparate impact theory, the plaintiff asserts that a facially neutral employment practice was used to unlawfully discriminate against him. Subjective intent to discriminate need not be proven. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645–46, 109 S.Ct. 2115, 2118, 104 L.Ed.2d 733 (1989). Daniel has not asserted her claim under this theory; and, the court finds it inapplicable to her case. A plaintiff suing under the disparate impact theory must demonstrate that a specific employment practice has created the disparate impact. *Wards Cove*, 490 U.S. at 656–57, 109 S.Ct. at 2124–25. Daniel never attempted to make this necessary showing.

The other theory is called known as "disparate treatment". Though plaintiff and her counsel never expressly stated that they were operating under this avenue of Title VII, the court finds that it is the relevant theory for this case. The court will first consider the application of disparate treatment theory to Daniel's claim of discriminatory pay. The Supreme Court annunciated the relevant considerations for determining whether a plaintiff has established a *prima facia* case of racial discrimination under Title VII for refusal to hire in its landmark decision *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Adapting those elements to allegations of discriminatory pay, Daniel must establish the following: (1) that she belongs to a racial/sexual minority, (2) that she asked for and was qualified for a raise, (3) that despite her qualifications she was denied a raise, and (4) at the time she was denied additional compensation the pay of Mobile managers of a different race and/or sex was higher than what she received. If the plaintiff fails to establish a *prima facia* case, then the defendant need not proffer any valid reasons for its action. *Hawkins v. Ceco Corp.,* 883 F.2d 977, 981 (11th Cir.1989). But if the plaintiff does meet her *prima facia* burdens by a preponderance of the evidence, then a presumption of impermissible discrimination arises. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

When the plaintiff meets these initial requirements, the burden of production shifts to the defendant employer who must then come forth with admissible evidence articulating a legitimate, nondiscriminatory reason for the adverse employment action "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The burden of proving intentional discrimination, however, always remains with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. So when the defendant meets its burden of production, the presumptions of intentional discrimination raised by the *prima facia* case is rebutted and drops

completely from the case. *Hicks,* 509 U.S. at 510–11, 113 S.Ct. at 2748–49; *see also Trotter v. Board of Trustees of the University of Alabama,* 91 F.3d 1449, 1454–55 (11th Cir. 1996). This leaves the plaintiff with his ultimate burden of proving by a preponderance of the evidence that the adverse employment action was motivated by unlawful discriminatory intent. *Trotter,* 91 F.3d at 1456–57.

Though Daniel never clearly stated that she was basing her claims on her membership in the separate and distinct protected class of black females, the court will consider her claims under this rubric on the basis of language in Plaintiff's "Proposed Determinations of Fact and Conclusions of Law" alleging that plaintiff was discriminated against on the basis of "her sex or race and a combination of both" and the fact that plaintiff's attempts at proof centered around the existence of this special class. No substantive case was ever made that Church's discriminates against females or blacks in general. *See infra.* When asserting a Title VII claim under this paradigm, a plaintiff argues that the combination of her membership in both a minority race and minority gender place her in a special protected class—in this case the class of black females. The effect of utilizing this line of analysis is that a defendant cannot rebut a *prima facia* case of intentional discrimination against a black female by showing that female employees as a whole were treated the same as all males employees or that black employees as a whole were treated the same as white employees. The purpose is to focus specifically on the treatment of black females as compared to every other employee outside the class of black females. *See Jefferies v. Harris County Community Action Assoc.,* 615 F.2d 1025 (1980).

In 1980, the Fifth Circuit recognized black females as a separate protected class. *Jefferies,* 615 F.2d at 1034. In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Thus, this court must con-

sider Daniel's claim as alleging grounds for relief under the separate class of black females. The court notes that recognition of this class in this particular case subsumes analysis under straight-up claims of race and gender discrimination because if there were discrimination by an employer against all its female employees and/or all its black employees, such would necessarily include discrimination against black female employees.

For the most part, Daniel has not satisfied her *prima facia* burdens so as to establish grounds for recovery on her disparate pay claim because she has not provided a meaningful comparison of her salary with those of managers outside her class of black females, namely white males, white females, and black males. *See Morgan v. City of Jasper,* 959 F.2d 1542, 1545–46 (11th Cir.1992) (holding that both nominal comparators with more experience and nominal comparators with "special duties and responsibilities" are not valid comparators when analyzing a black female's Title VII claim). Initially, the court notes that there are no white male comparators in this case. The only white female to consider is Phyllis Dean ("Dean"). Dean managed the only training store in the Mobile area. It was established at trial that the management of a training store is more demanding than managing the typical Church's Chicken store. So, even though Daniel and Dean shared the same title as manager, a meaningful comparison of their salaries cannot be made because of their substantially different obligations and duties. *Morgan,* 959 F.2d at 1545–46. There are only two black males to consider: Ernest Caffey and Gerald Cross. Cross is not a valid comparator because unlike Daniel, he was recruited away from a competitor and had prior experience managing with other companies. *Id.*

From the evidence presented to the court, however, it appears that Ernest Caffey is a valid comparator for the period January 31, 1991 through February 11, 1993 (except for parts of March and April of 1992) when Caffey was making a higher salary than Daniel. Thus, plaintiff has stated a *prima facia* case as regards Caffey during this time. But Daniel has not met her ultimate burden of proving intentional discrimination. Church's

rebutted the presumption of intentional discrimination raised by the *McDonnell Douglas* inference when it presented evidence that the difference in salary was based on Daniel's lower performance levels. Daniels did not offer any counter evidence calling into question the validity of this legitimate, non-discriminatory reason given for the disparate pay. *See also, infra.*

Even if Daniel has stated a prima facia case of pay discrimination on the basis of sex and gender or a combination of both, the court concludes that plaintiff has failed to meet her ultimate burden of proof. No evidence of intentional discrimination by Church's against Daniel was presented at trial. All the court has before it is circumstantial evidence which, even if it satisfies Daniel's *prima facia* requirements, does not prove intentional discrimination by a preponderance of the evidence. Church's produced a good deal of evidence in the form of documentation and testimony which show that Daniel was paid according to her job performance—a legitimate, nondiscriminatory reason for any difference in pay between Daniel and other managers.

Daniel alleged that seniority was a prime factor in setting salaries and that she was the most senior of the Mobile managers. Daniel never offered any evidence substantiating her assertion that seniority is important in determining a manager's salary; only Daniel's unsupported conjectures were made to the court. The testimony of Coachman and Brooks, and company manuals which discount Daniel's assertions, show that job performance was the ultimate consideration. And according to Church's evidence, Daniel's performance was deficient when compared to all the other managers. Daniel could have introduced evidence in the form of inspections and reviews of these other managers to disprove Church's position but she failed to do so.

Daniel did put forth evidence that the profits at Store No. 327 were higher when she was manager as compared to those made by her predecessor. While this may indicate that Church's made a poor business decision in firing Daniel, it does not prove discriminatory intent on the part of the defendant.

Moreover, Daniel never countered the testimony of Brooks and Coachman that a decision to fire is based on personal performance or Coachman's testimony that greater profits were expected at Store No. 327 regardless of who managed it because of the high sales volume there.

Other important considerations for Church's in setting salary are whether a particular manager has prior managing experience and whether a manager was hired away from a competitor. Mr. Cross, whom Daniel is most concerned with in her claim, had both previously managed for other employers and been hired out of the hands of a competitor. Such qualifications naturally up the salary requirements of the outsider coming over to the employer versus those of an insider such as Daniel.

Daniel relied heavily at trial on Plaintiff's Exhibit 3, a chart of selected Mobile area managers' salaries prepared by defendant Church's. There are several problems with this chart in relation to Daniel's allegations. As for Daniel's claims of discrimination based on race or sex, the relevant comparators for Daniel, a black female, are males and whites. There is only one white on the chart. This single white female, Phyllis Dean, was paid more because of her superior performance and the higher demands of managing a training store. Because of the incompatible status of Dean and Daniel, there is an insufficient foundation for a finding of racial discrimination. In addition, two of the four black managers represented on the chart made more than Phyllis Dean at points during the relevant period.

As for Daniel's sex discrimination claim, the chart indicates no discrimination in pay based on gender. During most of the three year period, two females—Myra Moore (black) and Phyllis Dean (white)—led the pack in salaries. Furthermore, of the seven managers in the Mobile area between 1990 and early 1993, five were females (and four of those females were black). Of the two males, one of them (Ernest Caffey) was at the bottom or second from the bottom during all but one month of the applicable time. For the times when Daniel made less than either of these two males, Daniel did not overcome Church's evidence that the difference was based on performance levels and outside experience.

If there was intentional discrimination by Church's, Daniel has failed to prove it. There are many ways a plaintiff can prove intentional racial or sexual discrimination. They include but are not limited to: testimony by witnesses revealing the sexual or racial bigotry of plaintiff's superiors, the production of documents evidencing sexual or racial biases, and evidence showing that the facially legitimate reasons for an employment action asserted by the defendant are a pretext. Daniel failed to produce any such evidence to the court.

It is a reality of today's economic environment that not all similarly situated employees are paid the same. In many businesses, there are one or more employees that are paid less than employees with the same title or classification. In this case, Daniel was such an employee. While Church's may not have paid Daniel the same way as other managers, the court was not presented with sufficient evidence showing that her treatment was attributable to intentional gender or racial discrimination or a combination of both. While the court cannot cite Church's method of paying its managers as a model worthy of widespread duplication, it cannot say that Church's has violated the law.

## B. Discriminatory Discharge

Plaintiff alleges that her discharge by Coachman was a sham, that Brooks is the person actually responsible for firing her, and that Brooks terminated her for discriminatory reasons. The evidence does not support the notion of a sham nor the existence of a discriminatory discharge.

■ To establish a *prima facia* case of discriminatory discharge, a plaintiff must prove (1) that she is a member of a protected class, (2) that she was qualified for the job from which she was discharged, (3) that she was discharged, and (4) that her former position was filled by a non-minority. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir.1991) (citing *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir.1982)).

The fourth requirement may alternatively be satisfied by showing that she was terminated while others having comparable or lesser qualifications and not in her protected class were retained, or that she suffered from differential application of work or disciplinary rules. *Weaver*, 922 F.2d at 1525.

■ Daniel has satisfied the first three elements of a *prima facia* case of discriminatory discharge. However, she has failed to meet the fourth. Daniel made no attempt to present evidence showing that she was replaced by someone outside her protected class or that she was terminated while members of other classes with equal or lesser qualifications were retained. Daniel did allege that she suffered from differential application of work or disciplinary rules by arguing that she was subjected to greater and more stringent inspections and performance reviews than other Mobile area managers. However, Daniel never established such as a fact by a preponderance of the evidence. This allegation was not supported by other witnesses or illustrative documents. Without such evidence, Church's contention that Daniel was subjected to the same work requirements as other employees remains persuasive.

■ Even if Daniel had satisfied her *prima facia* burdens, she still failed to prove by a preponderance of the evidence the existence of a discriminatory intent on the part of Church's. Church's presented evidence that Daniel was discharged for declining performance—a legitimate, nondiscriminatory reason for the discharge—and Daniel did not prove that this was a pretext for discrimination. The only thing in the record supporting the existence of a pretext is Daniel's own testimony that she felt Brooks had her fired because he "just didn't like [her]". This, without more, is insufficient to overcome Church's evidence.

## C. Retaliatory Discharge

■ In order to prevail on her retaliatory discharge claim, Daniel must first establish a *prima facia* case by showing (1) that she engaged in a statutorily protected expression, (2) that she suffered an adverse employment action, and (3) that there is a causal relation between the protected expression and the adverse action. *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir.1994) (citations omitted). Daniel has met her *prima facia* burdens. She did engage in statutorily protected expressions when she made informal complaints to Brooks between 1990 and 1993 and the formal complaint to Borden, the Human Resources Manager, in 1990. Daniel testified that she made numerous oral complaints to Brooks about her pay and Brooks acknowledged in his testimony that he received at least three or four such complaints. Informal complaints of discrimination are protected expression under Title VII. *Rollins v. State of Florida Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989). Daniel suffered an adverse employment action when she was terminated on February 11, 1993. The causal link requirement is broadly construed: a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Meeks*, 15 F.3d at 1021 (citations omitted). Because the court cannot say that these two events are completely unrelated, Daniel has satisfied her *prima facia* burdens.

■ Once the *prima facia* case is established, the employer must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Meeks*, 15 F.3d at 1021 (citations omitted). The plaintiff must then demonstrate that the employer's explanations are a pretext for retaliation in order to satisfy her ultimate burden of persuasion as to the existence of retaliatory intent. *Id.* Church's met its burden of production by putting forth evidence that Daniel was discharged because the continued, documented decline in her performance. Daniel did not respond with sufficient evidence to support her contention that she was discharged in retaliation for her salary complaint. Even if the court was not completely persuaded as to Church's proffered explanation, it is not permitted make the inference of retaliation since Church's satisfied its burden of production. Without additional evidence to support Daniel's initial testimony that she feels she suffered retaliation because she complained about her pay, the court is unable to conclude

that Church's retaliated against Daniel when it discharged her.

### Conclusion

In light of the foregoing, **FINAL JUDG-MENT** is hereby entered in favor of defendant Church's and against plaintiff Daniel on the three claims presented at trial. Thus, Daniel shall have and recover **NOTHING** from the defendant on her claims of discriminatory pay disparity, discriminatory discharge, and retaliatory discharge. Further, Daniel's claims are **dismissed with prejudice.** It is hereby **ORDERED** that each party bear his own costs.