980 F.2d 648
 60 Fair Empl.Prac.Cas. (BNA) 822,
60 Empl. Prac. Dec. P 41,990,
37 Fed. R. Evid. Serv. 980
Issiah ROSS, Jr., Eddie Slaughter, William Morgan Porter,
Johnnie Lee Palms, James C. Homer, John W. Taylor, Vernon
Alexander Putman, Hosey J. White, Jr., Franklin Roosevelt
Scott, Gerry Plant, Tabitha Herring, George Rumph, Nanette
Tyson, Plaintiffs-Appellants,
v.
BUCKEYE CELLULOSE CORPORATION, Defendant-Appellee.
William Morgan PORTER, Plaintiff-Appellant,
v.
BUCKEYE CELLULOSE CORPORATION, Defendant-Appellee.
Issiah ROSS, Jr., et al., Plaintiffs-Appellees,
v.
BUCKEYE CELLULOSE CORPORATION, Defendant-Appellant.
Issiah ROSS, Jr., et al., Plaintiffs-Appellees, Cross-Appellants,
v.
BUCKEYE CELLULOSE CORPORATION, Defendant-Appellant, Cross-Appellee.
Issiah ROSS, Jr., Johnnie Lee Palms, James C. Homer, John W.
Taylor, Gerry Plant, Tabitha Herring,
Plaintiffs-Appellees, Cross-Appellants,
v.
BUCKEYE CELLULOSE CORPORATION, Defendant-Appellant, Cross-Appellee.
 Nos. 89-8378, 89-8703, 89-8722, 90-8470 and 91-8641.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 4, 1993.
 
 James Finkelstein, Albany, Ga., for Issiah Ross and William Morgan Porter, et al.
 John G. Skinner, Smith, Currie & Hancock, Atlanta, Ga., for Buckeye Cellulose Corp.
 Appeals from the United States District Court for the Middle District of Georgia.
 Before ANDERSON, Circuit Judge, HILL and ESCHBACH*, Senior Circuit Judges.
 ANDERSON, Circuit Judge:
 
 I. FACTS
 
 1
 Appellants in this action are all black, present or former employees of appellee Buckeye Cellulose Corporation ("Buckeye").[1] Buckeye is an Ohio corporation and a wholly owned subsidiary of Procter & Gamble Paper Products Company. Buckeye owns several plants in various states around the country, including one in Macon County, Georgia, near Oglethorpe, known as the "Flint River Plant." For a description of the Flint River Plant's organization and operations, see Ross v. Buckeye Cellulose Corp., 733 F.Supp. 344, 347-48 (M.D.Ga.1989) ("Buckeye I").
 
 
 2
 In December, 1979, Buckeye hired the first group of employees--known as "technicians"--to prepare for the opening of the Flint River Plant. In the Summer of 1980, Buckeye hired the remainder of the work force in four stages. Initially, all of the technicians within a hire group were paid the same amount. At the three and six month periods of employment, each technician received uniform pay increases. It was not until the end of nine months of employment that each technician entered the career planning process that determined the technician's wage based on individualized factors.
 
 
 3
 The career planning process gradually evolved into the Pay and Progression ("P & P") System that appellants' suits challenge as discriminatory. The district court described the process by which Buckeye established the technicians' initial career plans:[2]
 
 
 4
 First, Buckeye conducted Plant-wide shift team meetings to explain the system. The managers then gathered information about each technician's performance on the job. Each technician then met with his manager to discuss his performance level, and his or her interests, goals and expectations. Each technician completed an "Interest Form" to identify preferences for career plans. The Unit Management Team then met to evaluate the gathered information in conjunction with the employees' preferences and the "ideal skill mix." The Unit Management Team then assigned proposed career plans and submitted them for approval to the Pay and Progression Review Board. The Review Board either accepted or modified the proposed career plan for each employee and then assigned him or her to a pay curve level. A pay curve was, at that time, one of two pay levels on which a course of pay increases was charted in relation to the career plan and the timing intervals established by the plan. Once the career plans were approved by the Board, managers reviewed them with each technician.
 
 
 5
 Id. at 349.
 
 
 6
 Sometime in 1982, Buckeye made significant changes to the P & P System. Plant Manager Burt Richards created a method of measuring the value of the various skill areas in relation to one another by assigning a point value to each skill. Buckeye did not divulge these values to any of its employees, although "testimony at trial indicated that at least some employees became aware of the point values, their significance, and the skills necessary to obtain a desired goal/pay level." Id. Buckeye also instituted a ranking system whereby each technician's performance and contribution was "force" ranked on a scale of 1 to 5.[3] The district court found that this ranking system was "almost totally a subjective program, with few, if any, standards to guide the managers." Id.
 
 
 7
 Under the modified P & P System, Buckeye considered a technician's career plan, the skills contained therein (whether or not the technician ever actually acquired them), and the points assigned to those skills in order to establish the technician's pay curve. If the ranking system indicated that the technician's performance and contribution were either above or below average, the technician's pay might be shifted by, at most, one pay curve,[4] but this variance was not automatic. In addition, Buckeye assigned each of the five units in the plant an average pay curve rate that was to be maintained within the unit. In the Summer of 1982, Buckeye also began administering examinations, called "Qualification Review Boards," to gauge each technician's progress under his or her career plan. A qualification board generally consisting of between three and five members conducted the examination, which was oral and was not recorded. Buckeye provided guideline questions to the qualification board members, but the board members were not required to ask these questions and were free to ask any relevant questions. At the completion of the examination, the board members conferred to reach a consensus as to the appropriate rating for the technician based upon both objective standards and the board members' "gut feelings." Buckeye made an appeals process available to technicians who were unhappy with their Qualification Review Board results.
 
 
 8
 In 1982, after the first series of Qualification Review Boards had been administered, Buckeye undertook a second career planning process similar to the first. This time, however, technicians who had not achieved a certain level of proficiency in their Qualification Review Boards often were not allowed to receive additional skills in their career plans and sometimes were not allowed to retain those in their initial career plans. The district court found that these second career plans "were the essential ingredient in establishing a technician's pay curve." Id. at 351. Furthermore, the court found that each technician's pay curve, "once established, was the basis for his entire pay history at Buckeye, and was a chief result of the fundamental elements of the Pay and Progression System which left a great deal of responsibility with the subjective decisions of the managers." Id. After this second career planning process, there were no subsequent plant-wide reevaluations, although modifications to certain career plans occurred on individual bases.
 
 
 9
 In October, 1984, Buckeye froze its entire P & P System because of alleged low production, waning production quality, and high costs. The freeze precluded changes in technicians' pay curves from 1984 until 1987, when a revised P & P System went into effect.
 
 II. PROCEDURAL BACKGROUND
 
 10
 From 1985 to 1988, thirteen individual employees at Buckeye's Flint River Plant filed twelve separate lawsuits against Buckeye.[5] All thirteen plaintiffs brought actions under 42 U.S.C. § 1981 alleging racial discrimination in pay and in the terms and conditions of their employment. Appellants Ross and Porter also alleged discriminatory discharge in violation of 42 U.S.C. § 1981. In addition, eleven of the plaintiffs--all except appellants Rumph and Tyson--brought actions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., based on complaints of discrimination they had filed with the Equal Employment Opportunity Commission (EEOC) in March, April, and May of 1985. All of the suits filed in districts other than the Middle District of Georgia were transferred to the Middle District.[6]
 
 
 11
 On July 29, 1988, the District Court for the Middle District of Georgia consolidated for trial all of appellants' cases. Appellants' section 1981 claims were tried before a jury from September to December, 1988. On December 21, 1988, the jury returned verdicts regarding liability on these claims. The jury found in favor of Ross on his claim of discriminatory discharge and retaliation and on his claim of discrimination in the terms and conditions of his employment. The jury found in favor of Plant on his claim of pay discrimination. The jury returned verdicts for Buckeye with respect to the remaining claims, thus denying all section 1981 relief for all appellants except Ross and Plant.
 
 
 12
 After hearing additional evidence on January 6, 1989, the jury returned damage verdicts as to the two prevailing plaintiffs. The jury awarded Ross $65,000.00 in back pay and $10,000.00 for lost benefits of employment. The jury awarded Plant $10,000.00 in back pay and $1,000.00 for lost benefits of employment.
 
 
 13
 On March 21, 1989, the district court entered final judgment on the disparate treatment claims under section 1981. Pursuant to this court's holding in Lincoln v. Board of Regents of Univ. System of Georgia, 697 F.2d 928, 934 (11th Cir.), cert. denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983) (in resolving Title VII disparate treatment claim, district court bound by jury's verdict on section 1981 claim), the district court's order also entered judgment on appellants' Title VII disparate treatment claims. In addition to the jury verdict, the court awarded Ross and Plant interest on their back pay awards totaling $11,736.20 for Ross and $1,837.04 for Plant. The court also ordered Buckeye to reinstate Ross to his former position at the Flint River Plant. On April 10, 1989, the district court denied appellants' motion for new trial or judgment notwithstanding the verdicts on their unsuccessful disparate treatment claims.
 
 
 14
 The district court heard additional statistical testimony regarding appellants' Title VII disparate impact claims on May 1 and 2, 1989, and heard oral argument regarding disparate impact theory on June 27, 1989. On August 11, 1989, the court entered an order finding that appellants had established their claims of disparate impact by showing a causal connection between (1) an observed statistical disparity between the wages of Buckeye's black and white technicians and (2) the P & P System in effect at the Flint River Plant between 1982 and 1984. Buckeye I, 733 F.Supp. at 363. However, the court rejected Porter's claim that Buckeye's "practice" of terminating employees for absence and tardiness represented "a discreet [sic] employment practice or procedure as contemplated by the disparate impact theory of recovery" and, accordingly, declined to examine these termination policies. Id. at 347 (citation omitted).[7] On August 15, 1989, the court entered judgment on this order.
 
 
 15
 On April 2, 1990, the district court entered an order regarding Buckeye's liability to the eleven plaintiffs with Title VII disparate impact claims. Ross v. Buckeye Cellulose Corp., 733 F.Supp. 363 (M.D.Ga.1990) ("Buckeye II"). The court held that plaintiffs bore the burden of "establishing that they individually suffered injury as a result of [Buckeye's] discriminatory Pay and Progression System." Id. at 378. The court then found in favor of Herring, Homer, Palms, Plant, Ross, and Taylor, and against Porter, Putman, Scott, Slaughter, and White. Id. On April 16, 1990, the court entered judgment on this order.
 
 
 16
 On September 24, 1990, the district court held a hearing regarding damages for the six plaintiffs who prevailed on their disparate impact claims. On June 4, 1991, the court entered an order awarding damages, prejudgment interest, and attorney's fees. Ross v. Buckeye Cellulose Corp., 764 F.Supp. 1543, 1554 (M.D.Ga.1991) ("Buckeye III").[8] On June 28, 1991, the court entered judgment on this order.
 
 
 17
 On appeal, appellants argue that (1) the district courts in the Herring, Homer, Palms, Plant, Porter, Putman, Scott, Slaughter, Taylor, and White suits improperly changed venue to the Middle District of Georgia, (2) the trial court improperly excluded evidence that managers at the Flint River Plant were biased towards black employees, (3) the trial court erred in denying appellants' motion for directed verdicts or judgment notwithstanding the verdicts on their unsuccessful disparate treatment claims, (4) the trial court improperly limited closing arguments during the damages phase of the jury trial, (5) the trial court erred in rejecting Porter's claim that Buckeye's termination policy had a disparate impact on black technicians at the Flint River Plant, (6) the trial court erred in denying relief to Porter, Putman, Scott, Slaughter, and White based on disparate impact on black technicians' pay, (7) the trial court failed to provide Herring, Homer, Palms, and Ross with adequate damages for their claims of disparate impact on black technicians' pay, (8) the trial court erred in failing to provide injunctive and equitable relief to remedy the effects of Buckeye's discriminatory pay system, and (9) the trial court's award of attorney's fees was insufficient.[9] Buckeye cross-appeals, arguing that (1) appellants' Title VII disparate impact claims challenging Buckeye's P & P System are time barred, (2) appellants failed to establish that Buckeye's P & P System had a disparate impact on black technicians, (3) the trial court erred in finding that the P & P System adversely affected Herring, Homer, Palms, Ross, and Taylor, (4) the trial court awarded excessive damages based on disparate impact for Palms, Plant, and Taylor, and (5) the trial court awarded an excessive amount of attorney's fees.[10] We note that Buckeye does not challenge the jury verdicts in favor of Ross and Plant on their section 1981 claims.
 
 III. DISCUSSION
 A. Venue
 
 18
 As an initial matter, appellants claim that the district courts in the Herring, Homer, Palms, Plant, Porter, Putman, Scott, Slaughter, Taylor, and White suits erred in transferring venue to the Middle District of Georgia. Appellants argue that the district courts failed to consider whether the Title VII venue provision conferred on appellants a right or privilege to choose the forum for their suit and stress that appellants "sought a forum other than the Middle District because of the historical antipathy towards Civil Rights cases shown in that district." Appellants' Brief at 153 (Nov. 6, 1991).[11] On appeal, this court will overturn a trial judge's ruling that a transfer is justified only upon a showing of "a clear abuse of discretion." Howell v. Tanner, 650 F.2d 610, 616 (5th Cir. Unit B 1981), cert. denied, 456 U.S. 918, 102 S.Ct. 1775, 72 L.Ed.2d 178 (1982);[12] see also Richardson v. Alabama State Bd. of Educ., 935 F.2d 1240, 1248 (11th Cir.1991).
 
 
 19
 We hold that appellants have failed to demonstrate that the district courts abused their discretion in transferring venue to the Middle District of Georgia. 28 U.S.C. § 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In this case, it is undisputed that Buckeye's Flint River Plant and all employment records relevant to appellants' suits have, at all relevant times, been located within the Middle District of Georgia. In addition, it was reasonable for the district courts to assume that the overwhelming majority of the witnesses whose testimony might be relevant to the trial of appellants' claims resided in the Middle District of Georgia. Consequently, although it was proper for appellants initially to bring their Title VII suits in either the Northern or Southern District of Georgia, we hold that these courts did not abuse their discretion in transferring the suits to the Middle District of Georgia.[13]
 
 
 20
 B. Jury Trial on Section 1981 Disparate Treatment Claims
 
 
 21
 1. Exclusion of Evidence of Flint River Plant Managers' Racial Prejudice
 
 
 22
 Appellants argue that the trial court erred in excluding evidence that managers at the Flint River Plant had animosity towards black employees. According to appellants' offer of proof, a former Buckeye manager, James Hughes, would have testified that, while working at a Buckeye plant in Foley, Florida, managers who later worked at the Flint River Plant referred to their black technicians as "niggers" and put black employees in a group called "the bull gang," which was assigned "the dirtiest work in the plant." Record on Appeal, Vol. 35 at 5164. Hughes also would have testified that, while at the Foley Plant, Burt Richards, later the plant manager at Flint River who designed challenged portions of the P & P System, did whatever he could to get rid of black employees because he did not like having black people working for him. Id., Vol. 35 at 5165-66. Appellants assert that such testimony was relevant and probative on the issue of disparate treatment and, consequently, that the district court erred in excluding it. Appellants' Brief at 155.
 
 
 23
 We agree with appellants that evidence of "[d]erogatory remarks indicative of a discriminatory attitude" are generally admissible to prove discriminatory treatment. Brown v. Trustees of Boston University, 891 F.2d 337, 349 (1st Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); see also Hunter v. Allis-Chalmers Corp., Engine Div., 797 F.2d 1417, 1423 (7th Cir.1986) (in employment discrimination action, evidence that supervisor called blacks "niggers" was admissible to show supervisor's racial attitudes). In this case, appellants' argument on appeal suggests that Hughes' testimony might have been "smoking gun" evidence on the disparate treatment issue. In light of Buckeye's concession at oral argument that the managers may have made the alleged comments a mere three to five years before transferring to the Flint River Plant, we do not believe the fact the alleged comments were made at another plant significantly undercuts their probative value in this case. However, even if this court would have decided to admit the testimony at trial, on appeal, we will reverse a district court's ruling concerning the admissibility of evidence only on a clear showing of abuse of discretion. Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1524 (11th Cir.1985).
 
 
 24
 Our review of the record convinces us that the district court did not abuse its discretion in excluding Hughes' testimony. The district court based its decision on Federal Rule of Evidence 403, which permits the exclusion of relevant evidence "by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial transcript shows that the district court was concerned that, since Hughes' testimony might have opened the door to further evidence regarding activity at the Foley Plant, admitting the testimony would unnecessarily prolong a trial that had already taken two months. Record on Appeal, Vol. 35 at 5167. In addition, the record shows that the district court believed that appellants had already presented "evidence that can give the Jury the total picture at the Flint River Plant," and, therefore, that Hughes' testimony was cumulative. Id., Vol. 35 at 5169.
 
 
 25
 We are persuaded that appellants' counsel failed to explain adequately to the district court the importance of this evidence. The district court clearly expressed its willingness to admit the evidence, even if it would substantially prolong the trial, if the evidence appeared significant. Id., Vol. 35 at 5167. However, in response to this invitation to present a strong case for admission of Hughes' testimony, appellants' counsel merely stated that the evidence was important to impeach testimony that counsel had hoped, but failed, to elicit from Plant Manager Richards when Richards was previously on the witness stand. Id., Vol. 35 at 5170. Counsel never pointed out to the court that the evidence might be "smoking gun" evidence and did not otherwise highlight the significance of the evidence. After hearing counsel's argument, the district court indicated that, while it might allow the testimony for impeachment purposes, it would not permit it for the development of appellants' case. Id. On this record, we cannot say that the district court abused its discretion in excluding Hughes' testimony.
 
 
 26
 2. Denial of Motion for Directed Verdicts or J.N.O.V. on Appellants' Unsuccessful Disparate Treatment Claims
 
 
 27
 Appellants claim that the district court erred in denying their motion for directed verdicts or for judgment notwithstanding the verdicts on appellants' unsuccessful claims of pay discrimination and on Porter's claim of discriminatory discharge. In reviewing the district court's disposition of a motion for directed verdict or for j.n.o.v., we employ the same standard of review as that used by the district court to determine whether to grant either motion. MacPherson v. University of Montevallo, 922 F.2d 766, 770 (11th Cir.1991). This court must:
 
 
 28
 consider all of the evidence in the light most favorable to the nonmoving party and with all reasonable inferences drawn in favor of the nonmover. If the facts and inferences are so strong that the court believes that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict, the district court properly grants a directed verdict or j.n.o.v. If, however, the evidence is such that "reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions," it is improper for the district court to grant a directed verdict or j.n.o.v.
 
 
 29
 Id. (citations omitted).
 
 
 30
 Appellants argue that they made out a prima facie case of disparate treatment with respect to pay and that Buckeye failed to meet its burden to articulate a legitimate, nondiscriminatory reason for its actions.[14] See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-256, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981) (describing burdens in Title VII suit); Morgan v. City of Jasper, 959 F.2d 1542, 1547-48 (11th Cir.1992) (same). However, appellants' concession that Buckeye presented evidence that individual appellants had "occasionally made operating errors, been late or absent from work, or shown character flaws," Appellants' Brief at 164, is fatal to their argument. Buckeye's introduction of evidence of these legitimate, nondiscriminatory reasons for its actions clearly satisfied Buckeye's burden of production. The Supreme Court has stressed that an employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. Buckeye successfully rebutted the presumption of discrimination created by appellants' prima facie case when it presented evidence that "raise[d] a genuine issue of fact as to whether it discriminated against [appellants]." Id., 450 U.S. at 254, 101 S.Ct. at 1094. Appellants then had the burden of demonstrating "that the proffered reason was not the true reason for the employment decision." Id. at 256, 101 S.Ct. at 1095.
 
 
 31
 We cannot agree with appellants' assertion that, even if Buckeye met its burden of production, appellants conclusively demonstrated that any legitimate reasons Buckeye presented to explain its actions were pretexts. See Appellants' Brief at 165, 170. The transcript of the four-month trial of the discriminatory treatment issue is full of conflicting testimony regarding the motivations of Buckeye's decision-makers. The record makes it clear that any resolution of this issue involved difficult credibility judgments that are properly left to the jury hearing the evidence. Since we believe that reasonable and fairminded people in the exercise of impartial judgment might reach different conclusions regarding whether Buckeye had a discriminatory intent in making the decisions of which appellants complain, we hold that the district court did not err in denying appellants' motions for directed verdicts or j.n.o.v. on the unsuccessful claims of pay discrimination and on Porter's claim of discriminatory discharge.
 
 3. Closing Arguments to Jury
 
 32
 We review for an abuse of discretion appellants' claim that the district court improperly limited closing argument during the damages phase of the jury trial. See BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1474 (11th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 966, 122 L.Ed.2d 122 (1993). Appellants point to two instructions that they assert undercut their counsel's efforts to secure punitive damages for Plant and Ross, the two appellants who prevailed on their disparate treatment claims. First, the district court interrupted counsel's opening statement to the jury and instructed counsel not to refer to two alleged victims of discrimination who were not parties to this case. Record on Appeal, Vol. 64 at 9942. Second, the district court interrupted counsel's closing argument and instructed the jury not to consider evidence that Buckeye refused to reinstate Ross after the jury had found that Ross' discharge was discriminatory. Id., Vol. 64 at 9969, 9974.
 
 
 33
 After reviewing the trial transcript, we conclude that the district court did not abuse its discretion in limiting appellants' counsel's argument to the jury. The court prevented counsel from referring to the two alleged victims of discrimination because testimony regarding these two individuals had never been admitted into evidence. Id., Vol. 64 at 9942, 9988. As for the second intervention, the court did not allow counsel to refer to Buckeye's refusal to reinstate Ross as part of appellants' argument in favor of a punitive damages award because Buckeye was entitled to wait for the final judgment in Ross' suit to determine whether reinstatement or front pay would be the appropriate remedy. Id., Vol. 64 at 9970. Neither of the district court's interventions constituted an abuse of discretion.
 
 
 34
 Having rejected appellants' claims on appeal, we now turn to Buckeye's cross-appeal.
 
 
 35
 C. Disparate Impact of Buckeye's Pay and Progression System
 
 1. Statute of Limitations
 
 36
 Section 706(e) of Title VII required that appellants file charges with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred" in order to sue Buckeye under the statute. 42 U.S.C. § 2000e-5(e).[15] Buckeye argues that appellants' disparate impact claims challenging the P & P System at the Flint River Plant are time barred because the last allegedly discriminatory application of the P & P System to each appellant--i.e., their last career plan assignment--occurred more than 180 days prior to that appellant's filing of a charge with the EEOC. Appellee's Brief at 61-64 (Jan. 13, 1992). Appellants urge only two grounds for avoiding the time bar: continuing violation and equitable tolling. Appellants' Reply Brief at 8-11 (Feb. 21, 1992). Buckeye counters that appellants cannot maintain a theory of continuing violation. Appellee's Brief at 64-69. In addition, Buckeye claims that the district court erred in finding that the limitations period should be equitably tolled. Id. at 69-78.
 
 
 37
 We agree with Buckeye that appellants cannot maintain a theory of continuing violation. This court in Beavers v. American Cast Iron Pipe Co., 975 F.2d 792 (11th Cir.1992), has very recently reiterated the appropriate continuing violation analysis. The court distinguished between the present consequences of a one-time violation, which does not extend the limitations period, and a continuation of a violation into the present, which does extend the limitations period. The Beavers court relied upon Gonzalez v. Firestone Tire & Rubber Co., 610 F.2d 241 (5th Cir.1980).[16] In Gonzalez, the plaintiffs mounted a challenge similar to appellants' challenge in this case. The Gonzalez plaintiffs alleged that the company used a discriminatory testing system, and that as a result plaintiffs had been denied promotion or transfer to better paying jobs. The Gonzalez court articulated the following analysis, which was quoted and adopted in Beavers:
 
 
 38
 Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice. However, where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the requirement of 42 U.S.C. § 2000e-5(e) that the plaintiff file his charge of discrimination within 180 days of the discriminatory act.
 
 
 39
 Gonzalez, 610 F.2d at 249 (citations omitted), quoted in Beavers, 975 F.2d at 796. Applying that analysis, the Gonzalez court issued instructions for the district court to follow on remand:
 
 
 40
 On remand the district court should determine whether Firestone continued to base its selection of employees to receive job opportunities upon scores from an unvalidated battery of tests. If Firestone ceased to utilize such a testing system more than 180 days prior to the filing of Gonzalez's charge with the EEOC, then his Title VII complaint would be barred for failure to comply with 42 U.S.C. § 2000e-5(e) unless he could show either that Firestone's continuing to administer the test for the purpose of a validation study had a disparate effect upon the ability of Spanish-surnamed employees to obtain job opportunities or that Firestone denied him a promotion or transfer within the 180-day period on the basis of the prior testing. A failure to promote Gonzalez more than 180 days prior to the filing of his charge based on his prior test scores would not constitute a continuing violation.
 
 
 41
 Id. at 249-50. The Beavers court analyzed the Supreme Court precedent, including Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), and Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).[17] See also United Air Lines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Beavers concluded that the Supreme Court precedent "is entirely consistent with this court's traditional continuing violation analysis." 975 F.2d at 800.[18]
 
 
 42
 In Beavers, the plaintiffs made a disparate impact challenge to the company's policy of denying medical and dental insurance coverage to children of employees if those children did not reside full time with their employee-parent. The court applied the continuing violation analysis and concluded that the company's policy constituted a continuing violation. Although plaintiffs had first become subject to the policy long ago, the court held that the lack of coverage was not "merely the residual effect of a single discriminatory act occurring ... [at some] discrete point in time. Rather, it is the direct result of ongoing policy actively maintained by [the company]." Id. at 797.
 
 
 43
 The instant case is different from Beavers. In Beavers the challenged policy continued in operation. By contrast, in the instant case the challenged P & P System was not applied at any time within the limitations period. Because of the system-wide freeze imposed in October 1984, the P & P System in this case did not continue in operation. The allegedly discriminatory effects of the P & P System manifested themselves only on those periodic occasions when workers were evaluated for the purposes of assigning them career plans or modifying the plans previously assigned to them. In this respect, the employment practice challenged in this case is very similar to that challenged in Gonzalez. The former Fifth Circuit held that a failure to promote Gonzalez more than 180 days before the EEOC charge was not a continuing violation, notwithstanding the obvious fact that the failure to promote had continuing consequences for employee pay. Similarly, in this case an application of the P & P System more than 180 days before the EEOC charge would be time barred. The Gonzalez court noted that there would be no continuing violation if "Firestone ceased to utilize ... [the] testing system more than 180 days prior to the filing" of the charge. 610 F.2d at 249. That is precisely what happened in this case, because of the 1984 freeze. On account of the freeze, none of the appellants had their career plans revised during the 180 days preceding the date that they filed charges with the EEOC. Indeed, appellants do not contend that the P & P System was applied to any appellant within the limitations period.
 
 
 44
 Apparently recognizing this fact, appellants have shifted their focus from the P & P System itself to the 1984 freeze, arguing that the freeze can be challenged in its own right as a practice qualifying as a continuing Title VII violation. The district court accepted this argument, finding that the freeze "gave the [P & P] System 'a present legal significance'." Buckeye I, 733 F.Supp. at 356. We disagree. Although the 1984 freeze locked into place the allegedly discriminatory effect yielded by prior applications of the P & P System, it was not itself discriminatory. Since the freeze locked every technician at the plant, regardless of race, into the then-existing compensation, we conclude that it represents just the type of neutral act that the relevant precedent has indicated is not a continuing violation, but is a mere continuing effect. Applying the continuing violation/continuing effects distinction, we must conclude that the 1984 freeze cannot qualify as an ongoing Title VII violation. Thus, we conclude that appellants cannot avoid the time bar by application of the continuing violation theory.
 
 
 45
 The final theory upon which the district court relied to find that appellants' claims were timely filed was that of equitable tolling of Title VII's timing requirements. Buckeye I, 733 F.Supp. at 357. In Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), the Supreme Court held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court [under Title VII], but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Even before Zipes, this court had recognized that Title VII's timing requirements are subject to equitable tolling. See, e.g., Chappell v. Emco Mach. Works Co., 601 F.2d 1295, 1297-1302 (5th Cir.1979); Bickham v. Miller, 584 F.2d 736, 738 (5th Cir.1978); Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924, 931 (5th Cir.1975); cf. Coke v. General Adjustment Bureau, Inc., 640 F.2d 584, 591-92 (5th Cir.1981) (en banc) (reviewing Fifth Circuit precedent on equitable tolling of Title VII's timing requirements). In Reeb, 516 F.2d at 931, the former Fifth Circuit held that Title VII's period for filing a timely charge of discrimination with the EEOC "did not begin to run ... until the facts that would support a charge of discrimination under Title VII were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff." See also Allen v. U.S. Steel Corp., 665 F.2d 689, 692 (5th Cir.1982). In the present case, the district court based its finding of equitable tolling on its determination that "certain necessary information [about Buckeye's P & P System] was not disseminated to technicians, which information, if known would have supported this Title VII cause of action...." Buckeye I, 733 F.Supp. at 357.
 
 
 46
 After careful review of the record, we hold that the district court's finding of equitable tolling was clearly erroneous. Cf. Bickham, 584 F.2d at 738 (reviewing district court finding regarding equitable tolling under clearly erroneous standard). In order for equitable tolling to be justified in this case, the facts must show that, in the period more than 180 days prior to filing their complaints with the EEOC, appellants had no reason to believe that they were victims of unlawful discrimination. See Reeb, 516 F.2d at 930 (equitable tolling appropriate where, for six months, plaintiff had no reason to suspect that gender-based discrimination prompted termination). Even if appellants did not know all the facts regarding the mechanisms of this discrimination (e.g., the details of Buckeye's P & P System), equitable tolling would be inappropriate if they were aware that Buckeye was violating their right to be free of racial discrimination in their employment.[19] Cf. McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1487 (11th Cir.1984) (no tolling of limitations period for Age Discrimination in Employment Act suit where plaintiff "suspects that he may have been discriminated against on account of age and is also generally aware of his legal right to obtain redress for that wrong").
 
 
 47
 Once Buckeye raised the limitations issue,[20] appellants bore the burden of proving that equitable tolling of the limitations period was appropriate. See Jackson v. Seaboard Coast Line R. Co., 678 F.2d 992, 1010 (11th Cir.1982) (in Title VII action, plaintiff "bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied"); cf. Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 333 (D.C.Cir.1992) (plaintiff alleging discrimination in federal employment has burden of proving equitable reasons for failure to comply with Title VII's requirement that plaintiff proceed before agency charged with discrimination within 30 days of alleged Title VII violation). The trial transcript is devoid of evidence that appellants actually were--or that similarly-situated people with a reasonably prudent regard for their rights would be--unaware that they were victims of unlawful discrimination in the period more than 180 days prior to filing their complaints with the EEOC. On the contrary, the record contains anecdotal evidence of numerous confrontations in the early 1980's between individual appellants and management personnel over racial discrimination in rates of compensation,[21] the assignment of career plans,[22] Qualification Review Board results,[23] and discipline.[24] Based on this record, we conclude that the district court's finding that appellants established the extraordinary circumstances that justify equitable tolling was clearly erroneous.
 
 
 48
 Because appellants did not file charges of discrimination with the EEOC within the 180-day period and failed to establish grounds for equitable tolling, we hold that appellants' disparate impact claims challenging the P & P System at the Flint River Plant are time barred.
 
 2. Other Issues
 
 49
 Because we have determined that the disparate impact claims challenging Buckeye's P & P System are time barred, we do not address the other issues the parties have raised with respect to these claims. Furthermore, because our decision significantly alters the degree of success appellants have achieved in this litigation, we remand to the district court to determine the appropriate fee award.
 
 IV. CONCLUSION
 
 50
 For the foregoing reasons, we AFFIRM the district court's judgments awarding damages to Ross and Plant for disparate treatment and dismissing Porter's discharge claim of disparate impact. We also AFFIRM the challenged district court rulings regarding venue, the admissibility of evidence, appellants' motion for directed verdicts or judgment notwithstanding the verdicts on their unsuccessful disparate treatment claims, and closing arguments. We REVERSE the district court's judgments finding that Buckeye's Pay and Progression System had a disparate impact on black technicians, assessing liability and awarding damages for this employment practice, and awarding attorney's fees. We REMAND for further proceedings in conformity with this opinion.
 
 
 51
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 *
 Hon. Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Appellee's corporate name changed to Procter & Gamble Cellulose Corporation in the course of the proceedings before the district court, but this opinion will refer to appellee as "Buckeye."
 
 
 [2]
 A technician's "career plan" set out the particular "skill areas" (jobs within each unit of the plant's operations) in which the technician would train and the degree of proficiency to which the technician was to learn the skill. Technicians were assigned "primary," "cross," and/or "secondary" skills
 
 
 [3]
 The percentage of technicians that could receive any particular rank was limited
 
 
 [4]
 Although Buckeye's P & P System originally had only two pay curves, it eventually expanded the number of pay curves to six
 
 
 [5]
 On August 23, 1985, appellant Eddie Slaughter filed suit in the United States District Court for the Northern District of Georgia. On March 7, 1986, appellant Issiah Ross, Jr. filed suit in the United States District Court for the Middle District of Georgia. On December 19, 1986, appellants Tabitha Herring, James C. Homer, Johnnie Lee Palms, Gerry Plant, William Morgan Porter, Vernon Alexander Putman, Franklin Roosevelt Scott, John W. Taylor, and Hosey J. White each filed a separate suit in the United States District Court for the Southern District of Georgia. On August 29, 1988, George Rumph and Nannette Tyson jointly filed suit in the United States District Court for the Middle District of Georgia
 
 
 [6]
 Slaughter's case was transferred from the Northern District of Georgia on January 8, 1986. On January 12, 1987, all of the cases filed in the Southern District of Georgia were transferred
 
 
 [7]
 The district court had previously granted summary judgment to Buckeye on a similar claim advanced by Ross. Id. at 346
 
 
 [8]
 The court awarded $17,510.00 in back pay plus prejudgment interest and profit sharing benefits totaling 47.146 shares of Buckeye common stock and $24.15 in cash to Herring; $13,759.00 in back pay plus prejudgment interest and profit sharing benefits totaling 37.149 shares of Buckeye common stock and $19.09 in cash to Homer; $31,982.00 in back pay plus prejudgment interest and profit sharing benefits totaling 66.896 shares of Buckeye common stock, 1.388 shares of preferred stock, and $68.85 in cash to Palms; $23,760.00 in back pay plus prejudgment interest and profit sharing benefits totaling 85.100 shares of Buckeye common stock, 0.769 shares of preferred stock, and $63.37 in cash to Plant (less a $1,000.00 deduction from his profit sharing benefits); $21,971.00 in back pay plus prejudgment interest and profit sharing benefits totaling 54.410 shares of Buckeye common stock and $27.88 in cash to Ross; and $57,963.00 in back pay plus prejudgment interest and profit sharing benefits totaling 126.498 shares of Buckeye common stock, 3.572 shares of preferred stock, and $150.23 in cash to Taylor. Id. In calculating Plant's award of back pay and profit sharing, the district court subtracted the damage award he received under his § 1981 claim. Id. at 1550. The district court also ordered Buckeye to pay a total of $175,794.10 in attorney's fees. Id. at 1554
 
 
 [9]
 Appellants' fifth claim has no merit and warrants no discussion. Claims six through eight are moot in light of our holding, see infra part III.C.1., that appellants' Title VII disparate impact claims are time barred. With respect to Claim nine, appellants' arguments on appeal have no merit and warrant no discussion. Thus, this opinion will address only appellants' claims one through four
 
 
 [10]
 This opinion will address only Buckeye's first claim. Buckeye's claims two through four are moot in light of our disposition of its first claim. With respect to Buckeye's fifth claim, Buckeye's arguments on appeal are without merit and warrant no discussion; however, because all relief awarded by the district court on appellants' disparate impact claims is vacated by our holding, the case is remanded to the district court for a new determination of attorney's fees
 
 
 [11]
 Title VII's venue provision provides, in relevant part, that an action brought under Title VII "may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed...." 42 U.S.C. § 2000e-5(f)(3). Since the alleged discrimination took place in Georgia, appellants were free to bring suit in any of the state's three federal judicial districts. See Richardson v. Alabama State Bd. of Educ., 935 F.2d 1240, 1248 (11th Cir.1991)
 
 
 [12]
 This case was decided prior to the close of business on September 30, 1981, and is binding precedent under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)
 
 
 [13]
 Appellants have failed to convince this court that suits under Title VII lie outside the purview of the transfer clause of 28 U.S.C. § 1404. See Lewis v. Madison County Bd. of Educ., 678 F.Supp. 1550, 1552 (M.D.Ala.1988) (Title VII venue provisions within purview of 28 U.S.C. § 1404); cf. Richardson, 935 F.2d at 1248 (applying 28 U.S.C. § 1404 to Title VII case)
 
 
 [14]
 Appellants concede that Buckeye articulated a legitimate reason for firing Porter, his refusal to return to work after he was out on disability leave from January to July of 1986. Appellants' Brief at 169. We reject as frivolous appellants' suggestion that this reason was not "nondiscriminatory" on its face. See id
 
 
 [15]
 The amendment to this subsection contained in the Civil Rights Act of 1991, Pub.L. No. 102-166, § 112, 105 Stat. 1071, 1078-79 (redesignating existing text of 42 U.S.C. § 2000e-5(e) as par. (1) and adding par. (2)), did not alter the time for filing of charges under the facts of this case, and, therefore, we need not address the question of the retroactive application of this amendment
 
 
 [16]
 This case was decided prior to the close of business on September 30, 1981, and is binding precedent under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)
 
 
 [17]
 Appellants' reliance on Bazemore is misplaced. In Bazemore, the North Carolina Agricultural Extension Service had, prior to the enactment of Title VII, maintained racially-segregated branches and paid black employees less than white employees employed in the same positions. Although the Extension Service merged the two branches in 1965, it continued to pay black persons less than white persons employed in the same positions. 378 U.S. at 392-94, 106 S.Ct. at 3005. When the Extension Service continued after becoming subject to Title VII to pay black persons less than white persons even though employed in the same positions, the Supreme Court held that that constituted a current act of discrimination. Id., 378 U.S. at 394-96, 106 S.Ct. at 3006. In Bazemore, the discriminatory acts continued. By contrast, in the instant case appellants have identified no discriminatory acts which occurred during the limitations period. The Supreme Court in Lorance distinguished Bazemore in the same manner. See Lorance, 490 U.S. at 912 n. 5, 109 S.Ct. at 2269 n. 5 ("A facially-discriminatory system (e.g., one that assigns men twice the seniority that women receive for the same amount of time served) by definition discriminates each time it is applied.")
 
 
 [18]
 Appellants argue that Lorance has no application outside the context or seniority systems. The Beavers court did emphasize that the central holdings of Lorance were limited to the context of seniority systems. However, with respect to the continuing violation analysis, the Beavers court expressly recognized that Lorance was "merely an application of the traditional distinction" between a continuing violation and the present consequences of a one-time past act of discrimination. 975 F.2d at 799
 
 
 [19]
 We reject appellants' suggestion that the district court's finding of equitable tolling was correct since, prior to filing their complaints, appellants did not have all of the information necessary to prevail on their disparate impact claims. See Appellants' Supplemental Letter Brief at 7 (Aug. 17, 1992). The inquiry into whether equitable concerns justify tolling the limitations period focuses on whether appellants knew or reasonably should have known that Buckeye's P & P System operated in a discriminatory manner, not on whether appellants had enough evidence to prosecute successfully their disparate impact claims at trial. After all, once appellants finally brought their Title VII actions, they were able to take advantage of "liberal civil discovery rules [that] give plaintiffs broad access to employers' records in an effort to document their claims." Wards Cove Packing Co. v. Antonio, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733. Significantly, in this case, only after appellants filed complaints with the EEOC did Buckeye divulge any of the information--the complete salary history of the Flint River Plant employees, the assigned skill points, and the pay matrix--that appellants now claim they would "have had to know to have realized that they had a cause of action for the disparate impact of [Buckeye's] Pay and Progression System on blacks as a group at the plant." Appellants' Supplemental Letter Brief at 7 (Aug. 14, 1992); see also Appellants' Supplemental Letter Reply Brief at 3-4 (Sept. 1, 1992)
 
 
 [20]
 We reject appellants' argument that Buckeye waived the statute of limitations defense. Our review of the record, the briefs, and the supplemental briefs does not persuade us that Buckeye waived the defense. We note that Buckeye raised the limitations issue in its answer to each appellant's complaint. Appellants argue that a "Proposed Pretrial Order--Jury Case" failed to include the statute of limitations as a defense, and thus Buckeye should be held to have waived the defense. We are not persuaded. The proposed pretrial order was not signed by either counsel or by the district judge. Although appellants represent that it was prepared in August, 1988, and was used as a guide during the September-December, 1988, jury trial on the § 1981 claims, it was not filed until September 9, 1992, at which time the district court permitted it to be filed nunc pro tunc to August 15, 1988. Significantly, the statute of limitations issue now before this court relates only to the disparate impact claim under Title VII, a claim which was not part of the September-December, 1988, jury trial. Indeed, the proposed pretrial order indicates in its title that it related to the then imminent jury trial; the title was "Proposed Pretrial Order--Jury Case." Apparently, there was no pretrial order for the subsequent litigation of the disparate impact claim
 Even if we should assume arguendo that Buckeye waived the statute of limitations defense by its failure to specify it in the above-mentioned proposed pretrial order, our review of the record convinces us that appellants in turn waived their right to raise the waiver issue on appeal. On June 23, 1989, Buckeye filed a brief in which it urged the district court to find that appellants' disparate impact claims were barred by the statute of limitations. See Brief of Defendant Buckeye Cellulose Corporation Regarding Disparate Impact Issue, at 13-16 (June 23, 1989). Oral argument was heard before the district judge on June 27, 1989. Apparently, appellants made no argument to the district court, either at the June 27, 1989, oral argument or at any subsequent time, that Buckeye had waived the statute of limitations defense. Indeed, appellants do not suggest in their briefs on appeal that they presented to the district court their argument that Buckeye had waived its statute of limitations defense. Rather, appellants argue that they should be excused because the district court at the June 27, 1989, oral argument indicated that no more briefs were needed. We are not persuaded that appellants should be excused. Appellants do not suggest that the district court forbade their raising the issue at the June 27, 1989, oral argument. Moreover, the district court did not absolutely forbid further briefing; rather, the district court indicated that it would not allow further briefing without special order. Appellants do not suggest that they requested permission to brief the waiver issue. The district court noted in its discussion of the statute of limitations issue on the merits that appellants had failed to respond to this issue. See Buckeye I, 733 F.Supp. at 356. Since appellants failed to present to the district court their argument that Buckeye waived the statute of limitations defense, we decline to entertain the argument which is presented for the first time on appeal.
 
 
 [21]
 In 1983, Palms left his position as shift team coordinator because he was upset that he was being paid less than white technicians performing the same duties. Record on Appeal, Vol. 17 at 1205-09
 
 
 [22]
 In October of 1981, Slaughter complained to his manager that all the lowest paid positions in the wood yard were assigned to blacks. Supplemental Record on Appeal, Vol. 6, Tab 9 at 17-18. In 1983, Plant questioned his manager as to why black maintenance technicians were unable to have more skills added to their career plan. Record on Appeal, Vol. 13 at 424-25. On January 21, 1984, Ross went to see the Flint River Plant's Employee Relations Manager and complained that "black maintenance technicians were not allowed to cross train, while white technicians were allowed to cross train in process." Id., Vol. 36 at 5345; see also Exh. D-3 at 4
 
 
 [23]
 Following the administration of the Qualification Review Boards in 1982, Herring and Ross separately confronted their managers and expressed their belief that the qualification procedure discriminated against black employees. See Record on Appeal, Vol. 11 at 963-64 (Herring) & Vol. 36 at 5316 (Ross)
 
 
 [24]
 In 1983, Scott complained to his manager that black employees were more harshly disciplined than their white counterparts. Record on Appeal, Vol. 22 at 2292-94